J-A01010-20

2020 PA Super 245

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.W.-B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.B., MOTHER & G.W.-B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1642 EDA 2019 |

Appeal from the Order Entered June 11, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002108-2013,
FID# 51-FN-004204-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: N.W.-B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.B., MOTHER & G.W.-B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1643 EDA 2019 |

Appeal from the Order Entered June 11, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002387-2016,
FID# 51-FN-004204-2013

BEFORE:   NICHOLS, J., MURRAY, J., and COLINS, J.[*]

OPINION BY NICHOLS, J.:                                Filed: October 8, 2020

    J.B. (Mother) and G.W. (Father) appeal from the orders granting the

petitions to compel their cooperation with a home visit by the Philadelphia

_____

[*] Retired Senior Judge assigned to the Superior Court.

Department of Human Services (DHS).[1]  Mother claims that DHS failed to establish probable cause to compel her cooperation with a home visit.  Mother also contends that the order violated her First Amendment free speech rights by prohibiting her from photographing or recording the DHS workers conducting the home visit.  We affirm in part and reverse in part.

Mother and Father are the parents of Y.W.-B., born in June 2012, and N.W.-B., born in January 2015 (collectively, Children).  On May 31, 2019, DHS filed the instant petitions to compel Mother's cooperation with a home visit.

In its petitions, DHS alleged, in part, that on May 22, 2019, it received a general protective services (GPS) report.  Pets. to Compel Cooperation with Child Protective Services Investigation of Abuse and/or Neglect, 5/31/19, ¶ j. The GPS report indicated that three weeks earlier, the family slept outside a Philadelphia Housing Authority (PHA) office, and that on May 21, 2019, Mother was outside the PHA office from 12:00 p.m. to 8:00 p.m. with a child.  *Id.* The petitions further stated that Mother told a Project Home outreach worker that she was not homeless, but that her previous residence was burned down. According to the petition, it was "unknown if [Mother] was feeding [Children

---

[1] Counsel for Mother and Father filed separate notices of appeals from the separate orders filed at the trial court's separate docket numbers for each child.  *Cf. Commonwealth v. Walker*, 185 A.3d 969, 976-77 (Pa. 2018). However, while these appeals are captioned in this Court as appeals by Mother and Father, it appears that Mother was the only party named in the notices of appeal and the only party captioned in the appellate briefs.  Therefore, we generally refer to Mother as the appellant throughout this opinion.

while] she stood outside of the PHA office for extended periods of time."[2] Pets. to Compel Cooperation with Child Protective Services Investigation of Abuse and/or Neglect, 5/31/19, at ¶ j.  According to the petitions to compel, DHS workers attempted to assess the family's home on the same day it received the GPS report, but Mother and Father refused them entry to the home or access to Children.  *Id.* at ¶ p.

On June 11, 2019, the trial court held a hearing on DHS's petitions to compel.  Mother and Father were represented by present counsel, and Children also appeared at the hearing.  DHS presented testimony from Tamisha Richardson, the DHS investigator assigned to the May 22, 2019 GPS report.  N.T., 6/11/19, at 4-7.  During Mother's cross-examination of Ms. Richardson, the trial court interjected and noted that it was familiar with Mother and Father.[3]  *Id.* at 12.  The trial court then questioned Mother regarding her address, whether she had utilities and income, and whether

_____

[2] The record does not contain a copy of the GPS report referenced in DHS petitions to compel.  We note that DHS did not present further evidence clarifying whether it obtained the information attributed to the Project Home outreach worker directly or from the same source who originally indicated that Mother was outside the PHA office.

[3] As noted below, the family has had prior involvements with DHS from 2013 to 2015.  Although not referred to by Mother, DHS, or the trial court, the record also indicates that in 2016, the trial court previously granted DHS's petitions to compel Mother and Father's cooperation with a home visit based on allegations that their home did not have water service.  The record contains no indication that DHS commenced any dependency proceedings based on the results of the 2016 petition to compel.  We add that the 2016 petitions to compel involved the same address of Mother's residence as in the instant petition to compel.

Children were "up to date" with medical checkups. *Id.* at 12-15. After the trial court addressed Mother regarding the need for an assessment of her home, Mother and her counsel objected, and the trial court stated that it found "ample probable cause," and that it was granting the petition. *Id.* at 18-19. The trial court then made arrangements for how the home assessment would be conducted. *Id.* at 19-32.

While arranging for the home visit, Mother noted that one of the DHS workers "became very angry and then there was a time over there that she was crying." *Id.* at 32. DHS's counsel subsequently asked the trial court to recall Ms. Richardson for further examination. *Id.* at 34. When the trial court asked about the purpose of the questioning, the following exchange occurred:

> [DHS's Counsel]: Well, Your Honor, there's additional things; videos, photography taken, posted on social media.
>
> THE COURT: They're not -- they're not -- oh.
>
> [DHS's Counsel]: -- that made her feel intimidated.
>
> THE COURT: All right. So you cannot -- you see, you cannot take pictures and video people; that's against the law, about video [sic] people.
>
> [Mother]: I have video of public officials performing a public function --
>
> THE COURT: No. No. No. No. No. No. See, the problem is, you don't want to listen. You want to do what you want to do and that's why you get yourself in trouble, okay. You got to start listening, because my patience only goes this far, okay.
>
> When they go there, I want you to treat them with as much respect that you want them to treat you. It's a two-way street. No pictures, no harassment, nothing on social media, because that could get you in trouble and arrested. Because just like you feel threatened, they feel threatened.

- 4 -

* * *

[DHS's Counsel]: Your Honor, and for the videos that have --

[Mother]: Is this courtroom recording?

[DHS's Counsel]: -- and what they have of her on social media, may they be removed?

THE COURT: Remove the videos from social media.

*Id.* at 34-36.

The trial court entered the orders granting DHS's petitions to compel cooperation and further directed that "Mother is NOT to record or video, nor post on social media" and "is to remove current videos regarding [DHS] from social media." Orders, 6/11/19. DHS conducted the home visit on June 14, 2019.[4]

Mother filed notices of appeals the same day as the hearing and submitted an amended statement of errors complained of on appeal the following day.[5] *See* Pa.R.A.P. 1925(a)(2)(i), (b). The trial court filed a responsive opinion asserting that (1) Mother's issues were moot; (2) there

_____

[4] During the June 14, 2019 home visit, Mother and Father allowed one DHS worker inside their home, and a family friend appeared to record the entire assessment. Additionally, Children were not at home during the assessment, and Parents did not permit DHS to access the basement or the living room that was "boarded up." N.T., 6/18/19, at 5. DHS asserted that it was not able to make a complete assessment and filed a second set of petitions to compel cooperation from Mother and Father. Following a hearing, the trial court denied DHS's second set of petitions on June 18, 2019. There are no indications that DHS took further actions in this matter.

[5] Mother also filed motions for a stay pending appeal in the trial court. The trial court denied the motions for a stay, and as noted above, DHS conducted the home visit on June 14, 2019.

was probable cause to compel Mother's cooperation with the home visit; and (3) its prohibition on Mother recording DHS workers during the home visit did not violate Mother's First Amendment rights. Trial Ct. Op., 9/9/19, at 5-8, 9-10.

Mother presents the following questions for review:

1. Should this Court review the merits of this matter where the trial court's order granted all of the relief requested by the [DHS], and where the trial court's order is capable of repetition yet may escape review?

2. Did the trial court err as a matter of law and abuse its discretion, violating the Fourth Amendment of the Constitution of the United States and Article 1, Section 8 of the Constitution of the Commonwealth of Pennsylvania where it determined that [DHS] presented the court with probable cause to search [Mother's] home in support of its [petitions] to Compel Cooperation?

3. Did the trial court err as a matter of law and abuse its discretion, violating the First Amendment of the Constitution of the United States where it ordered that [Mother] may not film, take pictures o[f], or record government employees acting in their official capacity as they searched her home?

Mother's Brief at 3.

## Mootness of Mother's Appeal

We briefly address Mother's first issue challenging the trial court's assertion that the issues in this appeal are moot.[6] In the lead case governing petitions to compel, ***In re Petition to Compel Cooperation with Child Abuse Investigation***, 875 A.2d 365 (Pa. Super. 2005), this Court concluded that the fact that the parties complied with an order compelling cooperation

---

[6] DHS agrees with Mother that the issues are not moot. DHS's Brief at 14.

did not render their constitutional challenges to the order moot. ***Pet. to Compel***, 875 A.2d at 369-71. The Court noted:

> It is impermissible for courts to render purely advisory opinions. In other words, judgments or decrees to which no effect can be given will not, in most cases, be entered by this Court.
>
> > Generally, an actual claim or controversy must be present at all stages of the judicial process for the case to be actionable or reviewable. If events occur to eliminate the claim or controversy at any stage in the process, the case becomes moot. Even if a claim becomes moot, we may still reach its merits if the issues raised in the case are capable of repetition, yet likely to continually evade appellate review. Therefore, if the issues raised by an appeal are substantial questions or questions of public importance, and are capable of repetition, yet likely to evade appellate review, then we will reach the merits of the appeal despite its technical mootness.

***Id.*** at 369-70 (citations and quotation marks omitted).

The ***Petition to Compel*** Court continued that "parents . . . who are ordered by the court to open their home to an agency investigator within a specified time period will be denied appellate review." ***Id.*** at 370-71. Moreover, the Court noted that the parents' claims that an order violated their constitutional rights against unreasonable searches and seizures constituted "questions of great importance, implicating fundamental constitutional rights enjoyed by every citizen of this Commonwealth . . . ." ***Id.*** at 371.

Here, as in ***Petition to Compel***, Mother's claim that the orders violated her constitutional rights to be free from an unreasonable search is not moot. ***See id.*** at 370-71. Further, Mother asserts that the orders violated her First Amendment right by prohibiting her from recording public officials performing

their duties. Similar to **Petition to Compel**, Mother's First Amendment claim is capable of repetition, yet likely to evade appellate review, and also raises questions of public importance. **See id.** Therefore, Mother's constitutional claims are not moot, and we will address them on their merits.

**Probable Cause to Compel Cooperation**

In her second issue, Mother argues that the trial court erred in finding probable cause to compel her cooperation with DHS. Mother's Brief at 19-34. Mother contends that the trial court applied a lower standard of probable cause than the standard applied in criminal cases involving anonymous tips. **Id.** at 24-25. Mother asserts that the allegations in the initial GPS report came from an anonymous report. **Id.** at 32. Mother contends that the trial court wrote "Fourth Amendment protections out of the law" for petitions to compel cooperation with home visits. **Id.** at 25. Specifically, Mother argues that "[s]hould this Court adopt the trial court's standard, any allegation from any anonymous source would be sufficient to trigger a [DHS] ability to enter and search a home." **Id.**

Mother also refers in passing to the "four corners" rule for reviewing a criminal search warrant to argue that DHS's petitions to compel lacked any independent basis to confirm the reliability and veracity of the reporter's tip. **Id.** at 32. Specifically, Mother argues that nothing in the petitions to compel or the testimony at the hearing substantiated the allegations in the GPS report. **Id.** at 29, 33.

Additionally, Mother asserts that DHS's petitions to compel lacked sufficient particularity because "it did not describe anything within the family's home that was relevant to [DHS's] investigation." *Id.* at 33. Mother further contends that "[t]here were no facts, in either the testimony presented by DHS nor in the [petition] itself, that there was anything within Mother's home that would further DHS's investigation or lead it to a conclusion. There was no 'specific link' here connecting anything inside the home to DHS's investigation." *Id.* at 29.

Mother adds that the testimony at the hearing contradicted the allegations in DHS's petitions. Specifically, Mother notes that DHS's petitions alleged that when DHS workers attempted to conduct the home visit on May 22, 2019, Mother took Children inside the home and she became aggressive when she denied DHS access to the home. *Id.* at 32. Mother emphasizes that Ms. Richardson testified at the hearing that Children were outside with Mother when Mother was talking to the DHS workers, and that Mother was not aggressive. *Id.* Moreover, Mother asserts that the trial court erred in finding that the GPS report alleged homelessness. Mother maintains that there was evidence that both the anonymous reporter and DHS were aware that the family had an address to contact them. In sum, Mother contends that DHS failed to assert any reliable information to sustain the trial court's finding of probable cause to have DHS enter her home to conduct a GPS assessment.

DHS responds that the trial court properly found probable cause to enter Mother's home. DHS notes that the Child Protective Services Law (CPSL), 23 Pa.C.S. §§ 6301-6387, and the enabling regulations require it to conduct investigations of reports of suspected child abuse and visit a child's home during its investigation. DHS's Brief at 15. DHS further argues that, unlike the scope of review in a criminal case, a trial court may consider matters outside the four corners of a petition to compel. *Id.* at 19.

DHS claims that its May 31, 2019 petitions to compel were supported with probable cause and cites Ms. Richardson's descriptions of the GPS report and her own investigation of the report. *Id.* at 19-21. DHS further contends that there was sufficient particularity because Ms. Richardson testified that she needed to assess the home to ensure it was appropriate for Children, had working utilities, and contained adequate food for Children. *Id.* at 23. DHS argues in the alternative that the petitions to compel set forth adequate allegations to compel Mother's cooperation to an assessment of her home. *Id.* at 21-22.

At outset, we note that Mother's and DHS's arguments raise questions of fact and law. Our review of factual questions determined by the trial court is deferential. *Cf. Commonwealth v. Marshall*, 568 A.2d 590, 595 (Pa. 1989). This Court will not disturb a trial court's finding of fact or credibility if it is supported in the record. *Id.* However, an appellate court owes no deference to the trial court's legal conclusions. *Cf. In re L.J.*, 79 A.3d 1073, 1080 n.6 (Pa. 2013). Nevertheless, in the context of a search warrant, a court

does not conduct a *de novo* review of an issuing authority's probable cause determination, but ensures that the issuing authority had a substantial basis for concluding that probable cause existed. ***Commonwealth v. Batista***, 219 A.3d 1199, 1202 (Pa. Super. 2019).

> The Fourth Amendment to the United States Constitution states:
>
> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[7] "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" ***Commonwealth v. Romero***, 183 A.3d 364, 397 (Pa. 2018) (plurality) (quoting ***Welsh v. Wisconsin***, 466 U.S. 740 (1984)).

In the context of criminal law, probable cause to search means "a fair probability that contraband or evidence of a crime will be found in a particular place." ***Commonwealth v. Jones***, 988 A.2d 649, 655 (Pa. 2010) (citation omitted). As our Supreme Court emphasized, "probable cause is based on

---

[7] Article I, Section 8 of the Pennsylvania Constitution states:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. I, § 8.

probability, not a *prima facie* case of criminal activity . . . ." ***Commonwealth v. Housman***, 986 A.2d 822, 843 (Pa. 2009). "Probable cause is a practical, non-technical conception requiring a consideration of the totality of the circumstances[.]" ***Commonwealth v. Wallace***, 42 A.3d 1040, 1048 (Pa. 2012) (citation omitted and formatting altered). "The totality of the circumstances test 'permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip[.]" ***Commonwealth v. Torres***, 764 A.2d 532, 537 (Pa. 2001) (citation omitted).

The CPSL defines "general protective services" as "[t]hose services and activities provided by each county agency for cases requiring protective services, as defined by the department in regulations."[8] 23 Pa.C.S. § 6303(a). The CPSL requires that an agency assess and make a decision to accept a family for services within sixty days of receiving a report that a child is in need of protective services. 23 Pa.C.S. § 6375(c)(1). The Pennsylvania Department of Human Services' regulations require a county agency to make at "least one home visit" during the assessment and make home visits "as often as necessary to complete the assessment and insure the safety of the child," and permit an agency to make "unannounced home visits." 55 Pa.

---

[8] The Pennsylvania Department of Human Services' regulations define "protective services" as "[s]ervices and activities provided by the Department and each county agency for children who are abused or in need of general protective services under this chapter." 55 Pa. Code § 3490.4.

Code § 3490.232(f)-(g). Commonwealth regulations define "general protective services," in part, as "[s]ervices to prevent the potential for harm to a child who . . . [i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 55 Pa. Code § 3490.223.

As stated in **Petition to Compel**, the Fourth Amendment, and by necessary implication, Article I, Section 8, apply to the provision of the CPSL and regulations governing a county agency's duty to investigate allegations of abuse or neglect inside a private home.[9] **Pet. to Compel**, 875 A.2d at 377. Therefore, a county agency must demonstrate probable cause to enter a private residence to conduct an investigation. **Id.** at 377-78 (stating that "[a]s we interpret the statute and agency regulations, [an agency] must file a verified petition alleging facts amounting to probable cause to believe that an act of child abuse or neglect has occurred and evidence relating to such abuse will be found in the home").

Additionally, all three members of this Court's panel in **Petition to Compel** joined the majority opinion and a concurring opinion by Judge Phyllis Beck. The concurrence noted:

> Future parties and courts faced with this issue to consider that the
> purposes and goals underlying the activities of child protective

---

[9] We note that the regulations for investigating an assessing the need for general protective services do not contain a provision authorizing the filing of petitions to compel cooperation. **See** 55 Pa. Code. §§ 3490.221-3490.242. The regulation discussing petitions to compel cooperation is listed in governing investigations for "child abuse." **See** 55 Pa. Code. § 3490.73.

- 13 -

agencies differ significantly from those of law enforcement generally. As a result, it would be unwise to apply the standard notion of probable cause in criminal law to cases such as these. While the Fourth Amendment certainly is applicable to these matters, we must not forget the very purpose for [CPSL]. Child Line and other services like it exist to encourage people to report incidents of potential danger to children. Likewise, we impose upon certain professionals an affirmative duty to report conduct they believe may be harmful to a child.[10] For these reasons, simply requiring an agency to show "probable cause" as it is defined in the criminal law is not enough. Instead, the nature and context of each scenario must be considered.

What an agency knows and how it acquired its knowledge should not be subject to the same restrictions facing police seeking to secure a search warrant. For instance, an agency's awareness of previous conduct on the part of parents would be relevant, indeed vital, information to include in a request for a court-ordered home visit. What constitutes probable cause in the child protective arena is far different from what constitutes probable cause in the criminal law. **Social services agencies should be held accountable for presenting sufficient reasons to warrant a home visit, but those same agencies should not be hampered from performing their duties because they have not satisfied search and seizure jurisprudence developed in the context of purely criminal law**. I urge the courts deciding these issues to accord careful consideration to the unique circumstances they present.

**Pet. to Compel**, 875 A.2d at 380 (Beck, J., concurring) (emphasis added).

As noted in the concurrence in **Petition to Compel**, there are differences between challenges to the issuance of a search warrant in a criminal case and the litigation of a petition to compel under the CPSL. **See id.** In criminal law, an affiant, often a police officer, obtains a search warrant

---

[10] We note that there is no indication in this case that DHS received information from a mandated reporter. **See** 23 Pa.C.S. §§ 6311-6320. Therefore, the reliability of information from a mandated reporter is not at issue in this case.

by completing and submitting an application and an affidavit of probable cause to an issuing authority *ex parte*. ***See generally In re 2014 Allegheny Cty. Investigating Grand Jury***, 223 A.3d 214, 221 (Pa. 2019); ***see also*** Pa.R.Crim.P. 203. The target of the search warrant has no opportunity to challenge the application or affidavit unless the issuing authority grants the warrant and until after the search warrant is executed. Under these circumstances, neither the issuing authority nor a reviewing court may consider any evidence outside the affidavits of probable cause in support of a search warrant. ***See Commonwealth v. Milliken***, 300 A.2d 78, 80 (Pa. 1973) (explaining that the rule requiring that the information in support of a search be reduced to writing was founded, in part, on the "inherent difficulty of reviewing challenged unrecorded [oral] ex parte testimony"). Nevertheless, this rule, sometimes referred to as the "four corners" rule, is procedural and not constitutional in nature. ***See*** Pa.R.Crim.P. 203(B); ***Commonwealth v. Conner***, 305 A.2d 341, 342-43 (Pa. 1973); ***Commonwealth v. Morris***, 533 A.2d 1042, 1044 n.2 (Pa. Super. 1987).

By contrast, neither the CPSL nor any rule of civil or family procedure limits a trial court's consideration of a petition to compel to the four corners of the petition. As was the case here, parents may appear before the trial court for a hearing **before** the court grants a petition to compel cooperation. Such a hearing may afford parents opportunities to cross-examine witnesses, challenge the veracity and reliability of the evidence in support of the petition, testify on their own behalf, and make legal arguments regarding probable

cause. Furthermore, as noted in **Petition to Compel**, in child cases, a county agency and the trial court may have prior experiences with parents that bear relevance to a determination of probable cause. **Pet. to Compel**, 875 A.2d at 380 (Beck, J., concurring). Therefore, we discern no basis to apply a criminal rule of procedure to restrict a court's review of a petition to the four corners of the petition itself, where the trial court holds a hearing on an agency's petition to compel.[11] **See id.**

In sum, we reiterate the holding in **Petition to Compel** that an agency "must file a verified petition alleging facts amounting to probable cause to believe that an act of child abuse or neglect has occurred and evidence relating to such abuse will be found in the home." **Pet. to Compel**, 875 A.2d at 377-78. Similarly, where the petition to compel involves an entry into a parent's home to investigate a GPS report, an agency must establish probable cause. **See id.**; **accord Romero**, 183 A.3d at 397. We further reiterate that the constitutional requirements of probable cause involve only "fair probabilities." **See Jones**, 988 A.2d at 655; **Housman**, 986 A.2d at 843.

Accordingly, an agency may obtain a court order compelling a parent's cooperation with a home visit upon a showing of a fair probability that a child

---

[11] We note, however, that this Court indicated that parents do not have a due process right to notice and opportunity to be heard on a petition to compel. **Pet. to Compel**, 875 A.2d at 379 (stating that "it would be unreasonable to direct the courts to give notice and schedule a hearing in every instance"). In such case, it is imperative that the agency reduce all allegations to writing. **See id.** at 380 (Beck, J., concurring).

is in need of services, and that evidence relating to that need will be found inside the home. *See Pet. to Compel*, 875 A.2d at 377-78; *see also* 55 Pa. Code § 3490.223. In making a probable cause determination, however, the trial court may consider evidence presented at a hearing on the petition, as well as the court's and the agency's prior history to the extent it is relevant. *See Pet. to Compel*, 875 A.2d at 380 (Beck, J., concurring). This Court will review the trial court's decision granting a petition to compel for a substantial basis for concluding that probable cause existed. *Batista*, 219 A.3d at 1202.

In *Petition to Compel*, an agency received a report alleging possible child abuse. *Pet. to Compel*, 875 A.2d at 368. The agency's petition in that case generally stated those allegations, indicated that a caseworker had contacted the parents and several medical facilities that had treated the child, and that a referral for alleged medical neglect was made. *Id.* at 378. The petition essentially asserted that the regulations required it to make a home visit. *Id.* This Court vacated the trial court's order granting the petition, reasoning that the trial court lacked any factual foundation for finding probable cause that the abuse could have occurred inside the child's home or that evidence of the abuse could have been found inside the child's home. *Id.*

In *Interest of D.R.*, 216 A.3d 286 (Pa. Super. 2019), *aff'd*, ___ A.3d ___, 45 WAP 2019, 2020 WL 3240581 (Pa. filed June 16, 2020), an agency received three reports of a father being intoxicated, that on one of those occasions, the father was with one of his children, and that the father abused the mother but criminal charges were dismissed after the mother refused to

testify. **D.R.**, 216 A.3d at 289. The agency conducted an investigation, which included interviews of all of the children. Further, the agency sought records of the allegation regarding the abuse of the mother, but was not able to corroborate the allegations. **Id.** The agency thereafter filed a motion to compel the parents' compliance to a home inspection and the father's cooperation with a drug test. **Id.**

The **D.R.** Court vacated the order compelling the parents' cooperation with a home visit. This Court explained that:

> While there were three separate reports regarding [the f]ather's alleged intoxication, none contained any specificity regarding the degree or type of impairment, nor alleged how such impairment caused any of the children to be abused or neglected. Only the first report alleged that a child was even present when [the f]ather appeared to be under the influence. And even then, [the agency] did not obtain potentially available security footage to see for themselves.
>
> More importantly, none of the interviews with the children resulted in further suspicion of abuse or neglect. [The agency] did not allege any concerns with [the m]other, beyond the allegation that she was a victim of domestic violence—a charge that could not be substantiated by court records. And critically, [the agency] did not allege a link between the alleged abuse/neglect and the parents' home. Nor did [the agency] allege exigent circumstances; in fact, the allegations were months old.
>
> It appears here that [the agency] merely sought compliance so that they could close the investigation. These facts do not constitute a sufficient foundation for a finding of probable child abuse or neglect under the CSPL. The court erred when it ordered the parents to submit to a home inspection.

*Id.* at 295 (footnotes and citation omitted).[12]

Mindful of the foregoing principles, we now consider DHS's petitions to compel Mother's cooperation with a home visit. Instantly, DHS filed the petition to compel alleging:

> b. On September 4, 2013, DHS received a [General Protective Services (GPS)] report alleging that [Mother], hit [Y.W.-B] on the arm; that it was unknown if [Y.W.-B] sustained an injuries, pain, or impairment; that [Mother] often hit [Y.W.-B]; that [Y.W.-B] was often heard yelling and screaming; that his basic needs were met, but the home was dirty and disordered; that [Mother] was unemployed; that she might have substance abuse issues; and that the home was heavily trafficked. This report was determined to be valid.

> c. On October 18, 2013, DHS received a GPS report alleging that the family's home was in deplorable condition; that there were holes in the walls; that the home was infested with fleas; that the home lacked numerous interior walls; that the interior structure of the home was exposed; that the home lacked hot water service and heat; and that the home appeared to be structurally unsound. The report further alleged that when [Y.W.-B] and his family's dog left the home, they were covered with fleas, and that [Father] was incarcerated. The report was determined to be valid.

---

[12] The Pennsylvania Supreme Court granted allowance of appeal on an issue regarding drug testing and subsequently affirmed this Court's decision to reverse that portion of order that compelled the father's cooperation with drug testing. *Interest of D.R.*, ___ A.3d ___, 45 WAP 2019, 2020 WL 3240581, *10 (Pa. filed June 16, 2020). Specifically, our Supreme Court concluded that the CPSL did not "expressly or implicitly authorize collecting samples of bodily fluids, without consent, for testing." *See id.* at *10. Because our Supreme Court resolved the issue on statutory grounds, it did not reach the agency's constitutional arguments that a drug test could be compelled using a standard less than probable cause. *See id.* at *9, *10 n.14. We note that our Supreme Court expressly stated it did not endorse the position that the allegations in the report "properly triggered the [a]gency's statutory obligation to investigate" as it was beyond the scope of the issue accepted for review. *Id.* at *9 n.13.

d. On October 18, 2013, DHS obtained an Order of Protective Custody (OPC) for [Y.W.-B] and placed him in foster care.

e. On October 29, 2013, [Y.W.-B] was adjudicated dependent and committed to DHS.

f. [Y.W.-B] remained in foster care until July 20, 2015, when the [c]ourt transferred physical and legal custody of [Y.W.-B] to [Parents]. [Y.W.-B] remained under protective supervision of DHS.

g. [Mother] gave birth to [N.W.-B in January 2015].

h. The family received in-home services through Community Umbrella Agency (CUA)-NorthEast Treatment Centers (NET) from January 26, 2015 through November 10, 2015.

i. On November 10, 2015, DHS supervision and [Y.W.-B's] dependent matter were discharged.

j. On May 22, 2019, DHS received a GPS report alleging that three weeks earlier, the family had been observed sleeping outside of a Philadelphia Housing Authority (PHA) office located at 2103 Ridge Avenue; that on May 21, 2019, [Mother] had been observed outside of the PHA office from 12:00 P.M. until 8:00 P.M., with one of the children in her care; that Project Home dispatched an outreach worker to assess the family; that [Mother] stated that she was standing outside of the PHA office in protest; that she stated that she was not homeless and that her previous residence had burned down; and that it was unknown if [Mother] was feeding [Children] she stood outside of the PHA office for extended periods of time. This report is pending determination.

k. On May 22, 2019, DHS confirmed the family's home address through a Department of Public Welfare (DPW) search.

l. On May 22, 2019, DHS visited the family's home. When DHS arrived at the home, only [Father] was present, and he refused to allow DHS to enter the home. [Father] contacted [Mother] via telephone and allowed DHS to speak with her. [Mother] stated that she was engaging in a protest outside of the PHA office; that she did not have [Children] with her while she was protesting; and that she would not permit DHS to enter the home. [Mother] subsequently returned to the home with [Children] in her care. DHS observed that [Children] appeared to be upset before [Mother] ushered them into the home. [Mother] further stated that [Children] had not been with her when she protested outside of the PHA offices; and that [Children] were fine and were not in need of assessments or services. [Mother] exhibited verbally aggressive behavior toward DHS and filmed the interaction outside of the home with her telephone. DHS did not enter the home, but observed from the outside of the home that one of the home's windows was boarded up.

m. On May 22, 2019, DHS returned to the family's home with officers from the Philadelphia Police Department (PPD). [Parents] continued to exhibit aggressive behavior and refused to allow DHS to enter the home. The PPD officers suggested that DHS obtain a court order to access the home.

n. [Mother] has a criminal history that includes convictions for theft-related and trespassing offenses.

o. [Father] has a criminal history that includes convictions for drug-related offenses in 1993. [Father] was also convicted of rape in 1994 and was sentenced to a minimum of 5.5 years to a maximum of 11 years of incarceration.

p. To date, [Parents] have failed to make the family's home available for evaluation and have failed to make [Children] available to DHS so that DHS can assess their safety. As a result, DHS is unable to complete its investigation of the May 22, 2019 GPS report.

Pets. To Compel Cooperation, 5/31/19, at ¶¶ b-p.

At the hearing on the petition, Ms. Richardson, a DHS investigator, testified that DHS "received a GPS investigation" on May 22, 2019, alleging "homelessness and inadequate basic care." N.T., 6/11/19, at 5. Ms. Richardson stated that she "made the initial outreach" that same day, but Mother and Father "made it clear to [her] that they [would] not allow [her] into the home . . . [a]nd they expressed to [her] to file a motion to compel and that's what [she] did." *Id.* at 5. The trial court questioned Ms. Richardson further about the purpose of the home visit and Ms. Richardson indicated that she needed to make sure Parents' home was appropriate, that the utilities were working, and that there was food in the house. *Id.* at 6.

During cross-examination by Mother's counsel, Ms. Richardson described Parents' demeanor that day as "I don't want to say aggressive, but just very clear that they did not want me to assess" the home. *Id.* at 7. Mother's counsel questioned Ms. Richardson about the allegations in the GPS report and petition and raised discrepancies over whether Children remained outside or went inside the home when Mother returned home with them. *Id.* at 7-11.

Upon questioning by the trial court, Mother noted that she was "engaging in an ongoing protest at the PHA headquarters." *Id.* at 15. Mother asserted that she was "being retaliated against."

In its Rule 1925(a) opinion, the trial court noted that it reviewed DHS's petitions to compel, the evidence presented at the hearing, as well as Mother's demeanor at the hearing. The trial court concluded that there was probable

cause to compel Mother's cooperation with the home visit. *See* Trial Ct. Op. at 6-8. The trial court explained:

> The [petitions to compel] and the hearing confirmed that one of the main factors of the DHS investigation is the matter of homelessness and if the alleged address of the family was suitable for Children. The home assessment by DHS would be able to determine if the claims for both homelessness and inadequate care of Children have merit. The trial court determined that the [petitions to compel] provided probable cause for DHS to complete an assessment of the family home. The allegations of the [petitions to compel] was, in part, that Mother was sleeping outside of PHA with Children. It was reasonable to ascertain whether [Mother and Father] had stable housing; therefore, [Mother and Father] needed to allow a home assessment. The testimony of the DHS witness was credible. Due to Mother's distrust of DHS, the trial court permitted Mother to bring witnesses to the home assessment.

*Id.* at 7-8.

Following our review, we find a substantial basis for the trial court's probable cause determination. *Cf. Batista*, 219 A.3d at 1202. The averments in DHS's petition, supported by evidence at the hearing, corroborated the initial report that Mother was outside the PHA office and the allegation that there was a fire at Mother's current residence. Although Mother asserted her previous residence was damaged by fire, the trial court was under no obligation to credit Mother's alleged explanation, particularly since DHS workers ultimately observed at least some damage to Mother's current residence, namely the boarded-up window, which was consistent with damage from a fire. *Cf. Commonwealth v. Torres*, 764 A.2d 532, 538 n.5, 539 & 540 n.8 (Pa. 2001) (corroboration of information freely available to the public

does not constitute sufficient indicia of reliability, but indications that a sources had some "special familiarity" with a defendant's personal affairs may support a finding of reliability).

The trial court was also entitled to consider its prior experiences with the family, as well as Mother's demeanor at the hearing. **See Pet. to Compel**, 875 A.2d at 380 (Beck, J., concurring). Moreover, it was within the province of the trial court to resolve conflicts between the petition to compel and the testimony at the hearing when evaluating whether there was probable cause to compel Mother's cooperation with the home visit. **Cf. Marshall**, 568 A.2d at 595.

Therefore, under the circumstances of this case, we find no merit to Mother's arguments that the trial court applied an improper probable cause standard, erred in ordering her compliance with the home visit based solely on an anonymous tip, or abused its discretion when weighing the totality of the circumstances. Unlike **Petition to Compel**, DHS did not rely solely on its duty to complete an investigation into allegations. **See Pet. to Compel**, 875 A.2d at 378. Moreover, there was a "link" between the allegations and DHS's petition to enter the home. **See D.R.**, 216 A.3d at 295. Accordingly, we affirm the trial court's conclusion that that there was a fair probability that Children could have been in need of services, and that evidence relating to the need for services could have been found inside the home.

**First Amendment Right to Record DHS Visit**

In her third claim, Mother argues that the trial court erred in prohibiting her from recording the DHS workers who conducted the home visit.[13]  Mother relies on **Fields v. City of Phila.**, 862 F.3d 353 (3d Cir. 2017), for the proposition that the First Amendment right to free speech necessarily incorporates the act of recording.  Mother's Brief at 37-39.  Mother asserts that under the rationale of **Fields**, the trial court should have determined that she had a First Amendment right to record the DHS workers conducting their investigation inside her home.  **Id.** at 45-46.

Moreover, Mother contends that the trial court erred in finding that its order prohibiting her from recording constituted a proper time, place, and manner restriction.  **Id.** at 41-42.  Specifically, Mother argues that there was no evidence that Mother or her recordings constituted a threat to the DHS workers.  **Id.** at 42-45.  Lastly, Mother contends that the trial court erred in concluding that there was a compelling interest in protecting the privacy of Children.  **Id.** at 46-47.

DHS, in its brief, "agrees . . . that the trial court erred in prohibiting Mother from photographing or recording the home assessment."  DHS's Brief at 14.  DHS provides no further discussion of the claim.

---

[13] Mother has not developed an argument that the trial court erred in ordering her to remove existing videos from her social media accounts.

The trial court, in its Rule 1925(a) opinion, addressed Mother's challenge as follows:

Regarding the First Amendment Right to Record, the United States Third Circuit Court of Appeals concluded, "In sum, under the First Amendment's right of access to information the public has the commensurate right to record—photograph, film, or audio record—police officers conducting official police activity in public areas." [***Fields***, 862 F.3d at 360]. The United States Third Circuit Court of Appeals also indicated that all recording is either protected or desirable, and the right to record police is not absolute. Instead, it is subject to reasonable time, place, and manner restrictions. ***Id.*** Additionally, pursuant to the Juvenile Act, there is a compelling interest in protecting minor children's privacy rights, and the protection of such is a key aspect of the Juvenile Act. 42 Pa.C.S.[] § 6307(a).

Mother's Counsel argues that the finding of [***Fields***] is that preventing Mother from filming, photographing, or otherwise recording the DHS employees performing the home assessment is a violation of Mother's First Amendment rights under the Constitution of the United States. The finding in [***Fields***] specifically referred to police officers that were conducting official police activity in public areas. The facts in this matter involve significantly different circumstances around the attempted recording, including that the government agents involved were not police officers and did not attempt to act in such capacity; the official business that was conducted during the home investigation was not official police activity; and the home assessment did not take place in a public area, but instead a private home. During the hearing for the Motion to Compel, it was determined that Mother had previously taken videos and photographs of DHS and placed the recordings on social media. Furthermore, allowing Mother to create recordings of the DHS regarding the investigation pursuant to the [CPSL] would can [sic] interfere with protecting Children's privacy rights. The trial court did take into account Mother's distrust of DHS, and the trial court permitted Mother to bring witnesses to the home assessment in lieu of recording individuals of DHS.

Trial Ct. Op. at 9-10. The trial court concluded that it did not err when prohibiting Mother from filming, photographing, or otherwise recording DHS's performance of the home visit. *Id.* at 10.

"[I]n reviewing First Amendment cases, appellate courts must conduct a review of the entire record." ***In re Condemnation by Urban Redevelopment Auth. of Pittsburgh***, 913 A.2d 178, 183 (Pa. 2006) (citation omitted); ***accord S.B. v. S.S.***, 201 A.3d 774, 780 (Pa. Super. 2018), *appeal granted*, 217 A.3d 806 (Pa. 2019). Our standard of review of the trial court's legal conclusions is *de novo*. ***Urban Redevelopment Auth. of Pittsburgh***, 913 A.2d at 183. "[T]o the extent that factual findings and credibility determinations are at issue," an appellate court will accept the trial court's conclusions insofar as they are supported by the record. ***Id.***

Our research indicates that courts apply varying levels of scrutiny to government actions affecting First Amendment rights. First, as our Supreme Court noted, strict scrutiny applies

> [w]hen the government restricts expression due to the content of
> the message being conveyed, such restrictions are allowable only
> if they pass the strict scrutiny test. That test is an onerous one,
> and demands that the government show that the restrictions are
> "(1) narrowly tailored to serve (2) a compelling state interest."

***Id.*** (citation omitted).

Second, a court will apply an intermediate level of scrutiny when, for example, "the governmental regulation applies a content-neutral regulation to

expressive conduct." *Id.* at 184 (citation omitted). Under that test, a regulation may be sustained when:

> 1) Promulgation of the regulation is within the constitutional power of the government;
>
> 2) The regulation furthers an important or substantial governmental interest;
>
> 3) The governmental interest is unrelated to the suppression of free expression; and
>
> 4) The incidental restriction on First Amendment freedoms is no greater than essential to the furtherance of that interest.

*Id.* (citation omitted). Similarly, "states may place content neutral time, place, and manner regulations on speech and assembly so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 902 (Pa. 2020) (citation and quotation marks omitted).

The third test "can fairly be denoted as the 'no scrutiny' test." *Urban Redevelopment Auth. of Pittsburgh*, 913 A.2d at 184. That test applies where "the government enforces a regulation of general applicability, First Amendment scrutiny is not implicated even when the enforcement of such a regulation would have some effect on First Amendment-protected activities." *Id.*

In *Commonwealth v. Bradley*, ___ A.3d ___, ___, 2020 PA Super 109, 2020 WL 2124419 (Pa. Super. filed May 5, 2020), this Court summarized *Fields* as follows:

- 28 -

Recently, the Third Circuit Court of Appeals explained:

> The First Amendment protects the public's right of access to information about their officials' public activities. It goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw. Access to information regarding public police activity is particularly important because it leads to citizen discourse on public issues, the highest rung of the hierarchy of the First Amendment values, and is entitled to special protection. That information is the wellspring of our debates; if the latter are to be uninhibited, robust, and wide-open, the more credible the information the more credible are the debates.
>
> To record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts. Hence to record is to see and hear more accurately. Recordings also facilitate discussion because of the ease in which they can be widely distributed via different forms of media. Accordingly, recording police activity in public falls squarely within the First Amendment right of access to information. As no doubt the press has this right, so does the public.

[**Fields**, 862 F.3d at 359] (citations and quotation marks omitted).[fn3] The Third Circuit, however, cautioned that all recording was not protected or desirable. **Id.** at 360. "The right to record police is not absolute. It is subject to reasonable time, place, and manner restrictions." **Id.** (quotation marks omitted). . . .

> [fn3] We treat decisions of the Third Circuit as persuasive authority on questions of federal constitutional law. **See Stone Crushed P'ship v. Kassab Archbold Jackson & O'Brien**, 589 Pa. 296, 908 A.2d 875, 883 n.10 (2006).

In **Fields**, the two plaintiffs brought Section 1983, 42 U.S.C. § 1983, claims against the City of Philadelphia and certain police officers, alleging, *inter alia*, that the officers illegally retaliated against them for exercising their First Amendment right to record public police activity. Plaintiff Amanda Geraci attended an anti-fracking protest at the Philadelphia Convention Center. Belonging to a police watchdog group, she carried her camera and wore a pink bandana that identified her as a legal observer. When the

police initiated the arrest of a protester, Geraci moved to record the arrest from a better vantage point. She did not interfere with the police. Yet, an officer abruptly pushed her and pinned her against a pillar for one to three minutes, preventing her from observing or recording the arrest. Geraci was not arrested or cited.

Plaintiff Fields, who was a sophomore at Temple University, was on a public sidewalk where he observed numerous police officers breaking up a house party across the street. The nearest officer was fifteen feet away from him. Using his iPhone, he photographed the scene. An officer noticed him taking pictures and inquired whether he liked taking pictures of grown men. The officer directed Fields to leave. He refused. The officer arrested Fields, seized his phone, and detained him. The officer ultimately released Fields and issued him a citation for obstructing highway and other public passage. Later the charges were withdrawn because the officer failed to appear at the court hearing.

Despite the defendants' decision not to argue against the existence of a First Amendment right, the district court *sua sponte* concluded that the plaintiffs' activities were not protected by the First Amendment because they presented no evidence that their conduct may be construed as expression of a belief or criticism of police activity. *Id.* at 356. On appeal, the Third Circuit disagreed, holding that "under the First Amendment's right of access to information the public has the commensurate right to record— photograph, film or audio record—police officers conducting official police activity in public areas." *Id.* at 360. The court, however, did not address the constitutional limits of this important First Amendment right because the defendants offered no justification for the action. *Id.* Accordingly, the court noted that no "countervailing concerns" existed to justify a departure from the general right to free speech under the First Amendment. *Id.*

*Bradley*, 2020 WL 2124419 at *5-*6 (some footnotes omitted).

In *Bradley*, this Court addressed such "countervailing concerns" in a case in which the defendant challenged his conviction for defiant trespass for recording in the lobby of a police station in which there was a "no-filming"

policy in place.  *Id.* at *6-*7.  The **Bradley** Court specifically concluded that

the no-filming condition in the lobby passed constitutional muster, reasoning:

> The Commonwealth presents several countervailing concerns to [the a]ppellant's argument that he had an absolute right under the First Amendment to videotape in the Lobby. Principally, the Commonwealth highlights Corporal McGee's testimony that the police department's no-filming condition in the Lobby was based on several reasons: (1) preventing the disclosure of confidential information relating to ongoing investigations discussed within secure areas of the police department; (2) safeguarding the identity of confidential informants and undercover officers; (3) ensuring their safety by preventing the risk of retaliation against them; and (4) ensuring and preserving the privacy of crime victims.  Indeed, the trial court found "Corporal [ ] McGee testified with regard to numerous grounds upon which the no[-]filming policy was based, citing confidentiality and victim safety as fundamental components."  Thus, the restriction or condition at issue is reasonable.
>
> The no-filming condition applies to all members of the public who visit the Lobby.  In other words, members of the public are granted a license to enter and remain in the Lobby, provided that they abide by the condition.  Among other things, the no-filming condition ensures the integrity of police investigations and activity.  The condition applies only to the Lobby and the interior of the police station, and not to areas outside of the police station, such as steps or entrances.  Admittedly, it prohibits only the recording, taping, and photographing within the Lobby.  The condition does not bar the use of parchment and quill in the Lobby.  It, therefore, is a reasonable restriction under the First Amendment because it is narrowly tailored to serve a significant governmental interest, *i.e.*, to ensure the safety, security and privacy of officers, informants and victims.  Moreover, it prevents interferences with police activity.  Accordingly, under the circumstances of this case, the recording or filming in the Lobby by members of the public is not a protected activity under the First Amendment.

*Id.* at *6-*7, *12.

- 31 -

Mother does not cite any cases discussing claims of First Amendment free speech protections for individuals that record official governmental activities inside the individuals' private residence. Our research has not revealed any cases dealing with First Amendment protections under these circumstances.[14] However, **Fields** recognized that "[a]ccess to information regarding public police activity is particularly important because it leads to citizen discourse on public issues, the highest rung of the hierarchy of the First Amendment values, and is entitled to special protection." **Fields**, 862 F.3d at 359 (citations and quotation marks omitted). Although this case involves DHS officials rather than police, and official actions within Mother's home rather than in public, we conclude that First Amendment protections extend to

---

[14] We note that in **Jean v. Mass. State Police**, 492 F.3d 25 (1st Cir. 2007), an individual, Paul Pechonis, recorded audio of police officers executing a warrantless search of his home. **Jean**, 492 F.3d at 25. Pechonis then disclosed the recording to Mary Jean, a political activist, who posted the recording on her website along with criticism of the District Attorney. **Id.** The **Jean** decision, however, focused on Jean's action in resolving a preliminary injunction of a police directive to Jean to remove the posting as a violation of Massachusetts' wiretapping statute, and not Pechonis' First Amendment right to record. **See id.** at 26.

In **Gaymon v. Borough of Collingdale**, 150 F. Supp. 3d 457 (E.D. Pa. 2015), a United States District Court considered a case involving the plaintiff recording officers intervening in a dispute between the plaintiff and a neighbor. **Gaymon**, 150 F. Supp. 3d at 460. The United States District Court did not squarely address the plaintiff's right to record in the plaintiff's civil action against the police officers for arresting the plaintiff based in part upon the act of recording. Instead, the court rejected the officers' claim of qualified immunity where even in the absence of a First Amendment right to record from the confines of one's home, the officers were not justified in entering the plaintiff's home without a warrant or consent. **See id.** at 468.

restrictions on "the stock of information from which members of the public may draw" when discussing public issues. ***See id.*** Therefore, we conclude that Mother's claim that the trial court improperly curtailed her right to record the DHS officials conducting a home visit is subject to intermediate scrutiny.

In the instant case, there was no evidence of any countervailing interests to support DHS's request for a no-recording provision. ***See*** N.T., 6/11/19, at 34-36 (indicating that the trial court denied DHS's request to recall Ms. Richardson and granted DHS's request for a no-recording provision based on DHS's counsel's assertion that there were "videos, photography taken, posted on social media . . . that made her feel intimidated"). ***Compare Fields***, 862 F.3d at 360 (declining to address the limits of the right to record where the defendant police officers offered no justifications when the plaintiffs were recording official activities in public), ***with Bradley***, 2020 WL 2124419 at *6-*7 (discussing evidence supporting the reasonableness of a policy limiting recording in the lobby of a police station). Moreover, we acknowledge the trial court's concerns regarding the privacy interests of Children. However, our review is necessarily limited to the issue raised in this appeal, specifically, the right to record, under the First Amendment, DHS employees conducting an assessment of a home, and not Mother's posting of such videos on social media.[15]

_____

[15] We add that there were no indications that Mother took videos containing images of Children or DHS employees interacting with the Children during her previous interactions with DHS.

Therefore, under the specific circumstances of this case, and in light of Mother's and DHS's arguments, we conclude that DHS failed to establish that its request for a no-recording provision was reasonable. We emphasize that our holding does not make the right to record absolute, consistent with established case law, it is subject to reasonable time, place, and manner restrictions. **See Fields**, 862 F.3d at 359. Accordingly, we reverse the no-recording provision of the trial court's order.

## Conclusion

In sum, we affirm the trial court's order that DHS presented the trial court with probable cause to search Mother's home in support of its petitions to compel cooperation and reverse the trial court's order that Mother may not film, take pictures of, or record government employees acting in their official capacity in their search of Mother's home. Further, we hold that that the trial court may establish reasonable time, place, and manner restrictions concerning Mother's request to film, take pictures of, or record government employees acting in their official capacity in her home, but that the record did not support the limitation imposed by the trial court in this case.

Order affirmed in part and reversed in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/8/20