**[J-39A&B-2021]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.W.-B., A MINOR | : | No. 1 EAP 2021 |
| | : | |
| | : | Appeal from the Order of Superior |
| APPEAL OF: J.B., MOTHER | : | Court entered on October 8, 2020 at |
| | : | No. 1642 EDA 2019 affirming and |
| | : | reversing the Order entered on June |
| | : | 11, 2019 in the Court of Common |
| | : | Pleas, Philadelphia County, Family |
| | : | Division at No. CP-51-DP-0002108- |
| | : | 2013 |
| | : | |
| | : | ARGUED: May 19, 2021 |
| IN THE INTEREST OF: N.W.-B., A MINOR | : | No. 2 EAP 2021 |
| | : | |
| | : | Appeal from the Order of Superior |
| APPEAL OF: J.B., MOTHER | : | Court entered on October 8, 2020 at |
| | : | No. 1643 EDA 2019 affirming and |
| | : | reversing the Order entered on June |
| | : | 11, 2019 in the Court of Common |
| | : | Pleas, Philadelphia County, Family |
| | : | Division at No. CP-51-DP-0002387- |
| | : | 2016 |
| | : | |
| | : | ARGUED: May 19, 2021 |

## OPINION

**JUSTICE DONOHUE**                                        **DECIDED: December 23, 2021**

A report from an unidentified source provided the sole basis for an allegation that

Mother (J.B.) was homeless and had failed to feed one of her children during a single

eight-hour period and led to the issuance of an order compelling her to allow the

Philadelphia Department of Human Services ("DHS") to enter and inspect the family residence. Before the Court is the question of whether DHS established sufficient probable cause for the trial court to issue the order permitting entry into the home without consent. We conclude that DHS did not establish probable cause and thus reverse the order of the Superior Court.

## I. Factual and Procedural History

Mother, who is politically active, lives with her two young children ("Y.W.-B" and "N.W.-B") and the children's father ("Father") in Philadelphia. On May 22, 2019, DHS allegedly received a general protective services report ("GPS report") from an unidentified source alleging possible neglect by Mother. Although DHS referenced this GPS report several times at the evidentiary hearing and used it to refresh its sole witness's recollection, it inexplicably never introduced it into evidence. The only information of record regarding the contents of the GPS report are set forth in the "Petitions to Compel Cooperation" (the "Petitions to Compel") subsequently filed by DHS. In paragraph "J" of the Petitions to Compel, DHS summarized the relevant allegations in the GPS report against Mother as follows:

> J. On May 22, 2019, DHS received a GPS report alleging that three weeks earlier, the family had been observed sleeping outside of a Philadelphia Housing Authority (PHA) office located at 2103 Ridge Avenue; that on May 21, 2019, [Mother] had been observed outside of the PHA office from 12:00 P.M. until 8:00 P.M. with one of the children in her care; that Project Home dispatched an outreach worker to assess the family; that [Mother] stated that she was not homeless and that her previous residence had burned down; and that it was unknown if [Mother] was feeding the children

[sic] she stood outside of the PHA office for extended periods of time.[1]  This report is pending determination.

Petitions to Compel, 5/31/2019, ¶ J.

In summary, and as set forth in paragraph "J," two allegations were made in the report:  first, around three weeks prior to May 21, 2019 (or on approximately May 1, 2019), the unidentified reporter claimed to have observed Mother's family sleeping outside of the Philadelphia Housing Authority.  Project Home pursued this allegation with Mother, who denied the family was homeless.  Second, on May 21, 2019, the unidentified source apparently indicated that he or she had also observed Mother, with one of her children, protesting outside of the office of the Philadelphia Housing Authority from noon until eight in the evening, and that it was "unknown" if Mother had fed the child during that eight-hour time period.  Mother does not challenge that these were the claims of possible neglect in the GPS report, and we thus rely on the allegations in paragraph J in our analysis and disposition.

The same source provided DHS with the address of the family home.  Project Home, a Philadelphia organization that attempts to alleviate homelessness, dispatched a worker on May 22, 2019 to approach Mother.[2]  In response to the Project Home

---

[1]  It is not entirely clear whether this allegation relates to the family sleeping outside of the Philadelphia Housing Authority three weeks earlier or on May 21st while Mother was protesting for eight hours.  Because this allegation regarding a failure to feed the children as she "**stood** outside of the PHA office" (rather than sleeping outside of the PHA office), herein we will assume that this allegation refers to Mother's protesting activities on May 21st.  The trial court made no finding of fact on the issue and the Superior Court did not reference it in its opinion.  In any event, this assumption has no effect on our disposition of the appeal before us.

[2]  The Project Home representative did  not testify at the evidentiary hearing and offered no evidence regarding whether or not the family was homeless.  The record merely (Continued…)

worker's questions, Mother stated that she was at the Philadelphia Housing Authority to protest and that she was not homeless, although she indicated that a previous home had been involved in a fire.

Later that same day, Tamisha Richardson, a DHS caseworker, verified the address of the family's home via a search of the Department of Welfare's records. When she arrived at this address later in the day after the Project Home worker's visit, she encountered Father, who denied Richardson entry into the residence and called Mother, who then spoke with her over the phone. Trial Court Opinion, 9/9/2019, at 6-7. Mother reiterated that she was protesting at the Philadelphia Housing Authority on May 21st and denied that she had either of the children with her on that date. Shortly thereafter, Mother arrived at the family home with the children and ushered them into the house. Mother informed Richardson that she would not allow her into the home absent a court order. *Id.* Richardson left but returned later the same day accompanied by police officers, again seeking entry into the home. Mother and Father continued to refuse entry. *Id.*

On May 31, 2019, without conducting any additional investigation or making any effort to corroborate the allegations of the unidentified author of the GPS report, DHS filed two Petitions to Compel the parents' cooperation with an in-home visit, one for each of the children. In the Petitions to Compel, DHS set forth the events of May 22, 2019 and detailed the family's prior involvement with DHS, which consisted of a dependency matter that began in 2013 when DHS received a GPS report indicating that

---

(…continued)
indicates that the representative asked Mother if her family was homeless and Mother responded that they were not. Petitions to Compel, 5/31/2019, ¶ J.

the family home "was in deplorable condition; that there were holes in the walls; that the home was infested with fleas; that the home lacked numerous interior walls; that the interior structure of the home was exposed; that the home lacked hot water service and heat; and that the home appeared to be structurally unsound." Petitions to Compel, 5/31/2019, ¶ C. On October 29, 2013, Y.W.-B was adjudicated dependent and committed to DHS[3] until July 20, 2015, at which time DHS transferred legal and physical custody back to Mother and Father. *Id.* ¶¶ E-F. The family received in-home services through local community agencies and treatment centers through November 10, 2015, at which time DHS ceased its protective supervision of Y.W.-B and discharged the dependency matter.[4] *Id.* ¶¶ H-I.

On June 11, 2019, the trial court held a hearing on the Petitions to Compel, at which Mother and Father appeared with counsel. DHS called Richardson as its single witness. Richardson testified to the events of May 22nd and explained that because of the allegations in the GPS report, she was required to assess the inside of the home to complete her investigation. N.T., 6/11/2019, at 11. She did not state or offer any evidence to support any belief that the conditions inside the home were deficient in any respect (as had been the case in 2013). The trial court then questioned Mother from the bench as to the status of her housing, the operability of her utilities, her employment status and whether the children were up-to-date with their medical and dental exams.

---

[3] N.W.-B was born in January 2015. Petitions to Compel, 5/31/19, ¶ G.

[4] The Petitions to Compel also noted Father's two criminal convictions in 1993 and 1994, the first for drug offenses and the second for rape. Petitions to Compel, 5/31/2019, ¶ O. The Petitions to Compel indicated that Mother's criminal history included convictions for theft and trespassing, but provided no timeframes. *Id.* ¶ N.

Mother responded by verifying her address and affirming that the utilities were functioning in her home, that she was employed, and that the children were current with their medical and dental exams. *Id.* at 12-14. During this inquiry, Mother asked the presiding judge why he was asking these questions of her and voiced her opinion that his inquiries did not relate to the allegations in the GPS report. *See id.* at 13, 19.

Mother also stated her view that the GPS report was made in retaliation for her protests of the Philadelphia Housing Authority. *Id.* at 15. She insisted that this was the third time[5] that DHS had "com[e] after me. Every time the reports were proven to be false. This is retaliation. I'm in the news. I'm engaging in an ongoing protest at the [Philadelphia Housing Authority] headquarters and I'm being retaliated against." *Id.*

After the close of testimony, the trial court stated that the probable cause requirement had been met and that it was going to grant the Petitions to Compel. *Id.* at 18. In this regard, the trial court stated that "[i]f there's a report, that's their duty to investigate. You don't cooperate then I have to force you to cooperate." *Id.* at 16. The order stated in full:

> AND NOW, this 11th day of June 2019, after conducting a Motion to Compel Cooperation Hearing the court enters the following order: Motion to Compel is Granted.

---

[5] A review of the lower court record reveals one such encounter. While not referenced in the trial court's opinion or in the briefs of Mother or DHS, the record reflects that in 2016, the trial court granted a DHS petition to compel Mother and Father to cooperate with a home visit based on numerous allegations of neglect, including that the family home did not have water service, that Mother and Father had a history of domestic violence and drug use, and that the neighbors were providing food and clothing to the children. Motion to Compel Cooperation, 10/27/2016, ¶ B. The trial court's order stated: "View to Discharge at the next listing if parents are compliant." Cooperation Order, 11/23/2016. After DHS conducted its home visit on November 30, 2016, the trial court dismissed DHS's motion to compel the next day (December 1, 2016). We were unable to locate any further records involving this encounter.

Further Findings: Child resides with mother and father.

Further Order: Mother is to allow two DHS social workers in the home to assess the home to verify if mother's home is safe and appropriate on Friday, June 14, 2019 at 5:00pm. Ms. Allison McDowell is to be present in mother's home as a witness to the home assessment. Mother is NOT to record or video, nor post on social media. Mother is to remove current videos regarding DHS works from social media. Parents or third parties are NOT to intimidate, harass or threaten any social workers.

Petitions to Compel Cooperation Order, 6/11/2019.[6] In its order, the trial court continued the evidentiary hearing until June 18, 2019.

Mother immediately filed a motion to stay the home inspection pending the resolution of her appeal. The trial court denied Mother's motion for a stay and the inspection occurred on June 14, 2019. When the hearing reconvened on June 18, 2019, one of the DHS caseworkers who performed the inspection testified that although Mother and Father did not permit the caseworkers to have access to the basement or the living room (which was under renovation), the rest of the home, which they did inspect, was safe and suitable for the children. N.T., 6/18/2019, at 12-13, 18. The trial court then dismissed the motion to compel. *Id.* at 20.

Mother filed a timely notice of appeal of the trial court's June 11th order.[7] [8] In her statement of matters complained of on appeal pursuant to Rule 1925(b) of the

---

[6] Before the Superior Court, Mother challenged the trial court's prohibition of filming the DHS social workers during the home visit on the ground that it violated her First Amendment right to freedom of speech, which necessarily incorporates the act of recording. The Superior Court agreed and reversed this portion of the trial court's order, indicating that "under the specific circumstances of this case, and in light of Mother's and DHS's arguments, we conclude that DHS failed to establish that its request for a no-recording provision was reasonable." *In Interest of Y.W.-B*, 241 A.3d 375, 395 (Pa. Super. 2020), *appeal granted*, 243 A.3d 969 (Pa. 2021).

Pennsylvania Rules of Appellate Procedure, Mother argued, inter alia, that the trial court's determination that DHS had established probable cause to allow the home inspection violated her rights under the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution.  In its written opinion pursuant to Rule 1925(a), the trial court recognized that a home inspection is subject to "the limitations of state and federal search and seizure jurisprudence[,]" Trial Court Opinion, 9/9/2019, at 6, and that to compel cooperation with a home inspection, DHS must establish probable cause that an act of child abuse or neglect has occurred and that evidence relating to the abuse or neglect will be found in the home.  *Id*. at 5-8.  The trial court relied on the concurrence in *In re Petition to Compel Cooperation with Child Abuse Investigation*, 875 A.2d 365 (Pa. Super. 2005)[9] (Beck, J., concurring) (hereinafter the "Beck Concurrence"), for the proposition that "the standard notion of

---

(…continued)

[7]   An order compelling cooperation with the scheduling and completion of an in-home inspection by a government agency is a final order for purposes of appeal.  *In re Petition to Compel Cooperation with Child Abuse Investigation*, 875 A.2d 365, 369 (Pa. Super. 2005).

[8]   We agree with the Superior Court's determination that Mother's constitutional claims are not moot.  *In Interest of Y.W.-B*, 241 A.3d at 381.  In general, the mootness doctrine requires that an actual case or controversy must be extant at all stages of review.  *See, e.g., Slice of Life, LLC v. Hamilton Twp. Zoning Hearing Bd.*, 207 A.3d 886, 897 (Pa. 2019).  This Court has recognized that issues "capable of repetition yet evading review" fall within a limited exception to the mootness doctrine.  *Reuther v. Delaware Cty. Bureau of Elections*, 205 A.3d 302, 306 n.6 (Pa. 2019) (citing *Nutter v. Dougherty*, 938 A.2d 401, 405 n.8 (Pa. 2007)).  We have likewise recognized an exception for issues that are of great and immediate public importance.  *Chester Water Auth. v. Pa. Dep't of Cmty. & Econ. Dev.*, 249 A.3d 1106, 1115 (Pa. 2021) (citing *Com., Dep't of Envtl. Prot. v. Cromwell Twp., Huntingdon Cty*., 32 A.3d 639, 652 (Pa. 2011)).  In our view, both exceptions apply here.

[9]   Given the prominence of this opinion and, in particular, the concurring opinion, the opinions are later addressed in detail at pages 27-30.

probable cause in criminal cases" does not apply to matters involving child protective services agencies and that "[w]hat an agency knows and how it acquired that information should not be subject to the same restrictions facing police seeking to secure a search warrant in a criminal matter."  Trial Court Opinion, 9/9/2019, at 6 (quoting *Petition to Compel Cooperation*, 875 A.2d at 380) (Beck, J., concurring)).

Operating under this principle, the trial court explained that it considered not only the allegations contained in the Petitions to Compel,[10] but also the testimony presented by DHS at the hearing and the consternation Mother expressed when questioned by the trial court regarding her ability to care for the children, her source of income, and her employment status.  *Id.* at 7.  The trial court explained that "one of the main factors of the DHS investigation [was] the matter of homelessness and if the alleged address of the family was suitable" for the children, and that the home inspection would determine if the claims of homelessness and inadequate care had merit.  *Id.*  Because of DHS's allegations of homelessness and inadequate care, the trial court found that "it was reasonable to ascertain whether the parents had stable housing; therefore, parents needed to allow a home assessment."  *Id.*

The Superior Court affirmed.  *In Interest of Y.W.-B*, 241 A.3d 375 (Pa. Super. 2020), *appeal granted*, 243 A.3d 969 (Pa. 2021).  Relying on its prior decision in *Petition to Compel Cooperation*, it first found that both the Fourth Amendment and Article I,

---

[10]  As discussed, this included averments regarding Mother's previous involvement with DHS in 2013, which involved allegations of physical abuse against the older child, Mother's employment status, whether the child's basic needs were being met, and inadequate housing.  Trial Court Opinion, 9/9/2019, at 1-2. In connection with those allegations, the child was adjudicated dependent for a period of time.  In November 2015, the trial court discharged the dependency. *Id.* at 2.

Section 8[11] apply to regulations promulgated pursuant to Pennsylvania's Child Protective Services Law ("CPSL"), 23 Pa.C.S. §§ 6301-6386, that govern an agency's duty to investigate allegations of abuse or neglect within a home. As such, to compel cooperation with a home inspection, an agency must establish probable cause before it will be permitted to enter a private residence to conduct an investigation. *In Interest of Y.W.-B*, 241 A.3d at 384 (citing *Petition to Compel Cooperation*, 875 A.2d at 377-78). Drawing on the Beck Concurrence, the Superior Court considered the different purposes of child protective laws and criminal laws as reflected in the procedural differences for obtaining a warrant in a criminal case and a motion to compel in a child welfare case. For instance, in criminal law, the procedure to obtain a search warrant is entirely ex parte such that the target of the search has no opportunity to challenge the allegations contained in the warrant application or affidavit before the warrant issues. *Id.* at 385 (citing *Commonwealth v. Milliken*, 300 A.2d 78, 80 (Pa. 1973); Pa.R.Crim.P. 203(B)). In contrast, under the CPSL, trial courts may conduct an evidentiary hearing before the issuance of an order granting a search of the home, at which time the parents may cross-examine witnesses, testify on their own behalf, and otherwise challenge the evidence put forth in support of the motion to compel. *Id.* Moreover, the Superior Court noted, there are no statutory provisions or procedural rules that cabin a

---

[11] In the "Counter-Statement of the Issues Involved'" in its brief filed with this Court, DHS contends that Mother failed to preserve a claim under Article I, Section 8 of the Pennsylvania Constitution in either the trial court or the Superior Court. Because Mother asserted violations of Article I, Section 8 before the trial court, the Superior Court and now in this Court, we conclude that Mother has preserved this constitutional claim. For present purposes, we take no position, one way or the other, with respect to Mother's contention that Article I, Section 8 provides greater constitutional protections than does the Fourth Amendment. Appellant's Brief at 42.

trial court's consideration of a motion to compel to the contents within the four corners of that motion, and so trial courts are free to consider additional evidence relevant to its inquiry, including any prior experiences they have had with the parents that would be relevant to a probable cause determination. *Id.* at 385-86. The court ultimately held that

> an agency may obtain a court order compelling a parent's cooperation with a home visit upon a showing of a fair probability that a child is in need of services, and that evidence relating to that need will be found inside the home. In making a probable cause determination, however, the trial court may consider evidence presented at a hearing on the petition, as well as the court's and the agency's prior history to the extent it is relevant.

*Id.* at 386 (internal citations omitted).

Applying this standard, the Superior Court pointed to the testimony of the DHS caseworker, who corroborated that DHS received a GPS report on May 22, 2019 alleging "homelessness and inadequate basic care," and that the home visit was intended to make sure the home was appropriate, the utilities were working, and that there was food in the house. Thus, the Superior Court found no error in the trial court's probable cause determination, as the averments in DHS's petition, supported by evidence at the hearing, corroborated the initial report and established a "link" between the initial allegations of homelessness and inadequate care and DHS's motion seeking to enter the home. *Id.* at 390.

This Court granted Mother's petition seeking allowance of appeal to consider the following issues:

(1)     Did the Superior Court err in creating a rule of law that violates Article 1, Section 8 of the Pennsylvania Constitution, when it ruled that where a Pennsylvania Child Protective

Services agency receives a report that alleges that a child is in need of services, and that there is a fair probability that there is evidence that would substantiate that allegation in a private home, where the record does not display a link between the allegations in the report and anything in that private home, then that government agency shall have sweeping authority to enter and search a private home?

(2) Did the Superior Court err in creating a rule of law that violates the Fourth Amendment of the United States Constitution, when it ruled that where a Pennsylvania Child Protective Services agency receives a report that alleges that a child is in need of services, and that there is a fair probability that there is evidence that would substantiate that allegation in a private home, where the record does not display a link between the allegations in the report and anything in that private home, and there was no showing of particularity, then that government agency shall have sweeping authority to enter and search a private home?

*In Interest of Y.W.-B*, 243 A.3d 969 (Pa. 2021) (per curiam). The constitutional challenges before us present questions of law over which our review is plenary. *See, e.g., Washington v. Dep't of Pub. Welfare*, 188 A.3d 1135, 1149 (Pa. 2018). With respect to findings of fact and credibility determinations of the trial court, the standard of review in dependency cases requires an appellate court to accept them "if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (quoting *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)).

## II.     The Parties' Arguments

Mother argues that the Superior Court's decision created an unconstitutionally diluted version of the probable cause standard to be applied when a government agency is seeking to compel cooperation with a home inspection based on allegations of child neglect. In her view, the Superior Court's adoption of the sentiment, derived

from the Beck *Concurrence*, that child welfare agencies should not be held to the same restrictions as police in criminal investigations in the acquisition of information to develop probable cause vitiates the protections against unreasonable searches guaranteed by the Fourth Amendment and Article 1, Section 8.

Mother believes that the Superior Court eliminated three aspects of constitutional protection. The first is the requirement that the order indicate with particularity the area and items targeted by the search. Mother claims that the trial court's order granting entry into her home completely failed to set forth the parameters of the search to be conducted. Mother's Brief at 26-27.[12] Second, she maintains that the Superior Court's ruling eliminates the need for an assessment of the reliability of the source of the information upon which probable cause is based. Noting that this Court has upheld this "reliability factor" as a critical part of a probable cause determination, she argues that the standard established by the Superior Court fails to incorporate an assessment of the reliability of the reporting source. *Id.* at 28-30 (citing *Commonwealth v. Clark*, 28 A.3d 1284 (Pa. 2011)). Third, probable cause requires a nexus between the allegations of neglect and the individual's home. Mother argues that the Superior Court eliminated this requirement by permitting a home assessment upon no more than the vague allegation that a child is in need of services. *Id.* at 32-33.[13] This case, Mother asserts,

---

[12]  Given our conclusion that DHS failed to offer sufficient evidence to establish probable cause to enter and search Mother's home, we do not reach Mother's contention that the trial court's order lacked sufficient particularity.

[13]  Highlighting the impact of the greatly relaxed probable cause standard, Mother argues that DHS's regulations require child protective agencies to make a home visit in the case of every GPS report. Mother's Brief at 32 (citing 55 Pa. Code § 3490.232(f)). In her brief filed with this Court, Mother cites to the Pennsylvania Department of Human (Continued…)

exhibits a complete lack of nexus between the allegations in the GPS report and anything that could be found within the home, and this lack of nexus by itself renders the search unconstitutional. *Id.* at 32-34.

Mother argues that before cooperation with a home inspection may be compelled, the trial court's probable cause determination should require consideration of not only the particularity, reliability and nexus requirements, but also the government's interest or justification for the search; the extent of the government intrusion being requested; and whether there are acceptable alternatives to a government intrusion that would address the government's interests. *Id.* at 55.

DHS agrees that probable cause must be established before a family may be compelled to cooperate with a home inspection, but it rejects the notion that the considerations identified by Mother must be strictly enforced. DHS's Brief at 16-17. DHS echoes the sentiment expressed in the Beck Concurrence that probable cause "in the child protective arena is far different from what constitutes probable cause in the criminal law." *Id.* at 19 (quoting *Petition to Compel Cooperation*, 875 A.2d at 380 (Beck, J., concurring)).

With these considerations in mind, DHS argues that there is no need for a particularity requirement in the context of probable cause for a home inspection for neglect because there is no particular "thing" that is the subject of such a search,

---

(…continued)
Services 2019 annual report, which reflects that in that year it received 178,124 GPS reports statewide. Of those, 95,671 were screened out, leaving county agencies to investigate 82,427 GPS reports – with 41,937 deemed valid and 40,490 unsubstantiated. Thus, according to Mother, this reflects that there are "nearly 100,000 potential searches into Pennsylvania homes each year." *Id.* at 17.

suggesting that neglect is a permeating condition found throughout the home. *Id.* at 24 ("[W]here the allegation in a GPS report is a lack of care in the home, an order to inspect the general conditions of the home **is** sufficiently particular.") (emphasis in original). In a similar manner, DHS contends that "there is almost **always** a nexus between the home and potential allegations of neglect" and that "[w]ithout searching the home, DHS has no way to ensure" that adequate care is being provided. *Id.* (emphasis in original). In this instance, in DHS's view, when assessing probable cause, it would have been more salient for the trial court to focus on the need for the search, the minimal intrusiveness of the requested search, Mother's prior involvement with DHS, and her evasive demeanor at the hearing. *Id.* at 20.[14] DHS also rejects Mother's contention that the Superior Court's standard is too vague, arguing that "two layers of protection" prevent this standard from being applied improperly – specifically, the counties' screening processes to weed out unfounded reports and the due process protections provided by the hearing on a motion to compel. *Id.* at 43-44. DHS argues that United States Supreme Court precedent supports less stringent probable cause requirements for the home inspections it performs, a contention we address in our analysis.

---

[14] DHS characterizes the assessment here as minimally intrusive and not designed to uncover criminal activity. DHS's Brief at 25-31. Because the search here was not for evidence of a crime and did not involve the police, DHS contends that "Mother had less privacy interests at stake." *Id.* at 29-30. Also weighing in favor of allowing the search, according to DHS, is the fact that the trial court found Mother evasive when it questioned her and that Mother had a history of involvement with DHS related to the conditions of her home. *Id.* at 32-35. Regarding the role of anonymous reports, DHS emphasizes that anonymous reports are crucial for child protective investigations, as anonymity often provides cover that allows reporters to feel comfortable making a report. *Id.* at 35-36.

## III. Analysis

### A. Constitutional Limitations on Home Entry

Pennsylvania's CPSL defines two types of reports received by county agencies. A general protective service report (a GPS report) is "[a] verbal or written statement to the county agency from someone alleging that a child is in need of general protective services[,]" which are in turn defined as, inter alia, services to prevent the potential for harm to a child who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 55 Pa. Code § 3490.223(i). In contrast, a child protective report ("CPS") is made by someone who has "reasonable cause to suspect that a child has been abused." 55 Pa. Code § 3490.11(a).

When a county agency receives a GPS report indicating that a child is not receiving proper care, the agency must within sixty days conduct an "assessment," which is defined as "[a]n evaluation … to determine whether or not a child is in need of general protective services." 23 Pa.C.S. § 6375(c)(1); 55 Pa. Code § 3490.232(e). As part of its assessment, the CPSL and its regulations provide that the county agency must perform "at least one home visit[.]" 55 Pa. Code § 3490.232(f); 23 Pa.C.S. § 6375(g) ("The county agency shall … conduct in-home visits."). The CPSL and its regulations further state that the county agency may initiate court proceedings if "a home visit … is refused by the parent." 55 Pa. Code § 3490.232(j); *see also* 23 Pa.C.S. § 6375(j). On the two prior occasions in which the Superior Court has addressed the issue, it has held that trial courts may grant an order requiring parents to cooperate with a home visit **only** when it is entered in accordance with the requirement of probable

cause pursuant to the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. *In Interest of D.R.*, 216 A.3d 286, 294 (Pa. Super. 2019) ("[A] CYS inspection of a home is subject to the limitations of state and federal search and seizure jurisprudence."); *Petition to Compel Cooperation*, 875 A.2d at 374. The parties to the present appeal both agree that an order permitting a home visit must comport with federal and state constitutional limitations. Mother's Brief at 13; DHS's Brief at 14.

The Fourth Amendment establishes the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no [w]arrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "[P]hysical entry of the home is the chief evil against which the ... Fourth Amendment is directed[.]" *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also Payton v. New York*, 445 U.S. 573, 586 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."). As the Supreme Court recently reiterated:

> When it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core, we have said, stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion. Or again: [f]reedom in one's own dwelling is the archetype of the privacy protection secured by the Fourth Amendment; conversely, physical entry of the home is the chief evil

against which it is directed. The Amendment thus draws a firm line at the entrance to the house.

*Lange v. California*, __ U.S.__; 141 S. Ct. 2011, 2018 (2021) (internal citations and quotations omitted).

Article I, Section 8 of the Pennsylvania Constitution provides:

**§ 8. Security from searches and seizures**

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8. Article I, Section 8 of the Pennsylvania Constitution protects all citizens in this Commonwealth against unreasonable searches by requiring a high level of particularity, i.e., that warrants (or here, an order to compel) describe "as nearly as may be" the place to be searched and the items to be seized with specificity. Article I, Section 8 also requires that a warrant be supported by probable cause to believe that the items sought will provide evidence of a crime. *Commonwealth v. Waltson*, 724 A.2d 289, 292 (Pa. 1998).

It is well established that "[p]robable cause exists where the facts and circumstances within the affiant's knowledge and of which he [or she] has reasonably trustworthy information are sufficient in and of themselves to warrant a person of reasonable caution in the belief that a search should be conducted." *Commonwealth v. Jacoby*, 170 A.3d 1065, 1081-82 (Pa. 2017). To assess whether probable cause has been established, the issuing authority makes a "practical, common-sense decision" based on the totality of the circumstances and the information in the affidavit (or here,

the Petitions to Compel), whether, given the relative veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that relevant evidence will be found in a particular place. *Id.* at 1082.

**B.      Standards for Assessing the Existence of Probable Cause with Respect to a Petition to Compel Entry into a Home in a Case Initiated by the Filing of a GPS Report**

While the parties to the present appeal agree that an order permitting a home visit must be supported by probable cause, they do not agree on what constitutes probable cause in a civil proceeding initiated by the filing of a GPS report.  DHS disagrees that probable cause with respect to home visits by social workers should be assessed based upon the fundamental principles developed primarily in the criminal law context, including that there be a nexus between the areas to be searched and the suspected crime committed, an assessment of the veracity and reliability of anonymous sources of evidence, and facts that are closely related in time to the date of issuance of the warrant.  DHS's Brief at 19.  DHS contends that social service agencies "should not be hampered from performing their duties because they have not satisfied search and seizure jurisprudence developed in the context of purely criminal law."  *Id.*  Relying upon *Wyman v. James*, 400 U.S. 309 (1971) and *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523 (1967), DHS contends that the protection of children is an essential societal value and thus the interests it serves through home visits are more worthy of the public's concern than are Mother's interests in the protection of the sanctity of her home.  DHS's Brief at 21.  Finally, DHS further insists that unlike an entry into a home to search for evidence of a crime, a child protective home assessment is nothing more than a "minimally invasive spot-check" for evidence

of neglect (e.g., like confirmation that the home had basic utilities, food and beds). *Id.* at 25-26.

We disagree with DHS's position. The evidentiary principles used to guide an analysis of whether sufficient evidence exists to establish probable cause has developed over many years in a wide variety of contexts. In this regard, while we are not bound by the decisions of federal circuit courts, we find persuasive the opinion of the Third Circuit in *Good v. Dauphin County Social Services for Children and Youth*, 891 F.2d 1087 (3d Cir. 1989). In *Good*, members of the Harrisburg Police and two social workers entered and searched a home without a warrant or other legal justification (e.g., consent or exigency). The social workers argued that they were entitled to sovereign immunity because the law had not been developed to make clear that because this was a child abuse case, their actions would not be governed "by the well-established legal principles developed in the context of residential intrusions motivated by less pressing concerns." *Id.* at 1094. The Third Circuit disagreed, ruling that the controlling standards for determining whether probable cause exists in cases involving possible harm to children are the same as those developed in criminal cases and that no perceived increase in the societal interest involved alters these standards.

> It evidences no lack of concern for the victims of child abuse or lack of respect for the problems associated with its prevention to observe that child abuse is not sui generis in this context. The Fourth Amendment caselaw has been developed in a myriad of situations involving very serious threats to individuals and society, and we find no suggestion there that the governing principles should vary depending on the court's assessment of the gravity of the societal risk involved. We find no indication that the principles developed in the emergency situation cases we have heretofore discussed will be ill suited for addressing cases like the one before us.

*Id.* (footnotes omitted)

This basic principle, namely that the requirement of probable cause to permit entry into a private home is not excused based upon any relative perceived societal importance, was further articulated by the United States Supreme Court in *Mincey v. Arizona*, 437 U.S. 385 (1978). In *Mincey*, the police argued that the extreme importance of the immediate investigation of murders justified a warrantless search of a murder scene. The Supreme Court emphatically disagreed:

> [T]he State points to the vital public interest in the prompt investigation of the extremely serious crime of murder. No one can doubt the importance of this goal. But the public interest in the investigation of other serious crimes is comparable. If the warrantless search of a homicide scene is reasonable, why not the warrantless search of the scene of a rape, a robbery, or a burglary? 'No consideration relevant to the Fourth Amendment suggests any point of rational limitation' of such a doctrine.

*Id.* at 393 (quoting *Chimel v. California*, 395 U.S. 752, 766 (1969)).

The *Wyman* and *Camara* cases relied on by DHS do not support its position. At issue in *Wyman* was a New York regulation that was part of a program to provide aid to dependent children (i.e., children in families who qualified for welfare). The regulation required social workers to make an initial home visit and subsequent periodic visits for public financial aid to begin and thereafter to continue. The Supreme Court concluded that the home visits in this circumstance did not violate the Fourth Amendment. In so ruling, the Court focused on the public interest in insuring that state tax monies are spent on their proper objects and encouraging welfare recipients to return to self-sufficiency; the limited scope of the entry and its consensual nature; the fact that the recipients were entitled to advance notice; and the fact that all welfare recipients were

subjected to the entries, which thus were not based on individualized suspicion of wrongdoing. *Wyman*, 400 U.S. at 318-23; *see also Walsh v. Erie Cty. Dep't of Job and Family Servs.*, 240 F. Supp. 2d 731, 745 (N.D. Ohio 2003).

The circumstances of the recipients of financial aid in *Wyman* differ significantly and substantially from those of Mother in this case. In *Wyman*, the persons at issue affirmatively sought financial benefits to which they were not automatically entitled to receive. The Court ruled that a state can lawfully condition the receipt of benefits on various conditions, including comprehensive disclosure of the applicant's financial status. In addition, the state can lawfully take steps, such as periodic inspections of recipients' homes, to ensure that fraud is not occurring and that the recipients remain entitled to continued benefits. Under *Wyman*, the diminishment of privacy of the recipients of the benefits was a quid pro quo for receiving the welfare payments. The recipients consented to the inspections in exchange for the receipt of benefits. In the present case, by contrast, Mother sought nothing from DHS other than her basic right to be left alone. The government cannot condition a parent's right to raise her children on periodic home inspection unsupported by probable cause.

In *Camara*, the Supreme Court addressed a circumstance where a San Francisco tenant challenged a city code provision that allowed health and safety inspectors to conduct warrantless searches of apartments to check for possible code violations. The Court began by emphasizing that an administrative inspection for possible violations of a city's housing code was a "significant intrusion upon the interests protected by the Fourth Amendment[.]" *Camara,* 387 U.S. at 534. The Court then

rejected any contention that the Fourth Amendment only protects citizens from searches to obtain evidence of a crime, but does not apply to civil administrative searches.

> It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior. For instance, even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority, for the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security.

*Id*. at 530-31 (footnote omitted); *see also Michigan v. Tyler*, 436 U.S. 499, 506 (1978) ("Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment.").[15]

---

[15] The Concurring and Dissenting Opinion identifies several cases we cite which presumably "rely" upon *Camara*. While certain of these cases cite to *Camara*, that fact is coincidental to the reasons for which we cite them. Concurring and Dissenting Opinion (Dougherty, J.) at 22 n.12 In connection with *Tyler*, for instance, we note only that administrative searches are governed by the Fourth Amendment. *See supra* p. 23. *Tyler* has no specific connection to searches in the child protective context; as it instead deals with firefighters entering private property to fight a fire, *Tyler*, 436 U.S. at 511, and it cites to *Camara* for the unremarkable proposition that once the firefighters leave, "additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches[,]" as set forth in *Camara*. *Id. New Jersey v. T.L.O*, 469 U.S. 325 (1985) reaffirms that the Fourth Amendment safeguards privacy against invasion by government officials generally (not just the police). It involved searches of school students by school officials." *Camara* was cited solely for the proposition that the Fourth Amendment applies outside the criminal context. *Id.* at 335 ("Because the individual's interest in privacy and personal security 'suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards" it would be anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.") (citations omitted). The Tenth Circuit in *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003) rejected the existence of a social worker exception to the Fourth Amendment. The court cited to *Camara* for the limited purpose of comparing *Camara*'s warrant requirement in the administrative context to a case in which the "special needs" doctrine permitted a warrantless search of someone's home. *Id.* at 1248 (citing *Griffin v.* (Continued…)

The Court also recognized, however, that an administrative inspection for possible violations of a city's housing code posed a unique situation, since unlike searches of a specific residence for a particular purpose (i.e., to find evidence of a crime), the investigation programs at issue were "aimed at securing city-wide compliance with minimum physical standards for private property[,]" and that even a single unintentional violation could result in serious hazards to public health and safety, e.g., a fire or an epidemic that could ravage a large urban area.  *Camara*, 387 U.S. at 535.  Accordingly, given this distinctive circumstance, the Court concluded that probable cause to issue a warrant to inspect exists "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.* at 538

---

(…continued)
*Wisconsin*, 483 U.S. 868 (1987)).  Finally, in *Walsh v. Erie County*, 240 F. Supp. 2d 731 (N.D. Ohio 2003), the federal district court declined to recognize a social worker exception to the Fourth Amendment and cited to *Camara* as an example of Fourth Amendment protections extending beyond the criminal context.  *Id.* at 744-45.

DHS does not contend that "special needs, beyond the normal need for law enforcement," *Commonwealth v. Hicks*, 208 A.3d 916, 938 (Pa. 2019), dispense with the requirement of probable cause in child neglect investigations.  To the contrary, as indicated above, DHS agrees that probable cause must be established before a court may order a home visit.  DHS's Brief at 14.  *See, e.g., Gates v. Texas Dep't of Protective & Regulatory Servs*., 537 F.3d 404, 424 (5th Cir. 2008) ("The purpose of TDPRS's entry into the Gateses' home – the investigation of possible child abuse – was closely tied with law enforcement … [and because] the need to enter the Gateses' home was not divorced from the state's general interest in law enforcement, there was no special need that justified the entry.").

In sum, these cases do not contradict the conclusion that no social worker exception to the Fourth Amendment exists or that traditional probable cause requirements apply in the context of home visits in connection with child neglect circumstances.

*Camara* has no application with respect to home visits to investigate allegations of child neglect. Unlike in *Camara*, which involved an agency's decision to conduct an area inspection based upon its appraisal of the conditions in the **area as a whole** to protect the public, probable cause to conduct a home visit depends upon whether probable cause exists to justify the entry into a **particular** home based upon credible evidence that child neglect may be occurring in that particular home. Moreover, and importantly, the scope of the search in the present case was in no respect limited to ensuring compliance with certain identified housing code violations. The search here allowed DHS investigators to search the home, including every room, closet and drawer in the home, based entirely upon their own discretion. In short, while the search here was not conducted by law enforcement, its scope bore little or no relation to a traditional administrative search. As such, the contention that *Camara*'s holding that administrative searches on an area basis are permitted where "reasonable legislative and administrative standards are satisfied"[16] is insufficient to allow the exhaustive

---

[16] In *Camara*, the Supreme Court held that given the unique and limited nature of the administrative searches at issue there, compliance with "reasonable legislative and administrative standards," in and of itself, satisfied the probable cause requirement. *Camara*, 387 U.S. at 535. No similar result may maintain for child protection home visits. The legislative and administrative standards in the CPSL and the regulations promulgated thereunder provide that at least one home visit must be conducted in every case in which a GPS report, 55 Pa. Code § 3490.232(f), or a CPS report, 55 Pa. Code § 3490.55(i), is received, without a requirement that any constitutional requirements be satisfied. In *Petition to Compel*, the Superior Court held that despite the mandatory nature of the need for a home visit in every instance, home visits are permitted only where the agency files "a verified petition alleging facts amounting to probable cause to believe that an act of child abuse or neglect has occurred and evidence relating to such abuse will be found in the home." *Petition to Compel*, 875 A.2d at 377. DHS in this case does not contest that Pennsylvania law requires that home visits, despite the mandatory nature of Sections 3490.232(f) or 3490.55(i), must be supported by a separate showing of the existence of probable cause. DHS's Brief at 8.

search of the entirety of family's home without a clear showing, based upon competent and, as necessary, corroborated, evidence establishing individualized suspicion exists allowing entry into a private home.

The Concurring and Dissenting Opinion nevertheless urges application of *Camara* with respect to child protection home visits. We decline to do so. Decided in 1967, *Camara* was the Supreme Court's first blessing of what has come to be known as a "dragnet search," namely one in which the government searches every person, place, or thing in a specific location or involved in a specific activity. *See generally* Eve Brensike Primus, *Disentangling Administrative Searches*, 111 Colum. L. Rev. 254, 263 (2011). Dragnet searches are not predicated on individualized showings of probable cause, nor indeed on **any** kind of individualized suspicion. *See City of Golden Valley v. Wiebesick*, 899 N.W.2d 152, 161 (Minn. 2017) ("Administrative search warrants must be supported by probable cause; not individualized suspicion but 'reasonable legislative or administrative standards for conducting an area inspection.'") (quoting *Camara*, 387 U.S. at 538); Christopher Slobogin, *The Liberal Assault on the Fourth Amendment*, 4 Ohio St. J. Crim. L. 603, 611 (2007) (noting the individualized suspicion requirement cannot be honored when large groups of people are subjected to searches or seizures). On the contrary, the hallmark of a dragnet search is its generality, as it reaches everyone in a category rather than only a chosen few. In addition to the safety-related inspection of every home in a given area in *Camara*, other dragnets include checkpoints where government officials stop, for example, every car or every third car driving on a particular roadway, *see also United States v. Martinez-Fuerte*, 428 U.S. 543, 550 (1976) (upholding checkpoint stops for illegal aliens near the border); and drug testing

programs that require every person involved in a given activity to submit to urinalysis. *See, e.g., Bd. of Educ. v. Earls*, 536 U.S. 822, 837 (2002) (permitting random drug testing of students involved in extracurricular activities).

Dragnet searches are justified if they satisfy a balance of interests and are necessary because a regime of individualized suspicion could not effectively serve the government's interest. In *Camara*, the Court suggested that if the legislative standards were reasonable, probable cause existed because "the only effective way to seek universal compliance with the minimum standards required by municipal codes is through routine periodic inspections of all structures." *Camara*, 387 U.S. at 535-36, 538. Based on this rationale, there could not reasonably be an individual suspicion because the inspections are **routine and periodic**. The Court has subsequently found that the traditional probable cause standard "may be unhelpful in analyzing the reasonableness of **routine administrative functions**." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 668 (1989) (emphasis added) (constitutionality of drug-testing program analyzing urine specimens of employees who applied for promotion to positions involving interdiction of illegal drugs). In *Von Raab*, a case involving a routine search that set out to prevent hazardous conditions from developing, the Court found that such searches can be conducted "without any measure of individualized suspicion." *Id.*

In the 1980s, the Court recognized a separate category of administrative searches for groups of people shown to possess **reduced expectations of privacy**, including students, *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985), government employees, *O'Connor v. Ortega*, 480 U.S. 709, 725 (1987), probationers, *Griffin v.*

*Wisconsin*, 483 U.S. 868, 879 (1987), and parolees, *Samson v. California*, 547 U.S. 843, 847 (2006). These types of searches typically carry stigmatic burdens imposed by suggestions of wrongdoing, as they target those who are generally more likely to be likely to engage in wrongdoing, e.g., probationers and paroles, than other individuals. Eve Brensike Primus, *Disentangling Administrative Searches*, 111 Colum. L. Rev.at 272. While these cases did not require the same level of individualized suspicion typically required to authorize a Fourth Amendment search because of the person's reduced expectation of privacy, the requirement of individualized suspicion was not entirely eliminated. In *Griffin*, for instance, the probationer had a reduced expectation of privacy because a refusal to permit a home visit to search for weapons was a violation of the terms of his or her probation, and because possession of a weapon without permission was a violation of law. *Griffin*, 483 U.S. at 871. Even given the reduced expectation of privacy, however, a relatively high degree of individualized suspicion was required, as the probation officer, before entering the home, had to consider "the reliability and specificity of [the informant's] information, the reliability of the informant (including whether the informant has any incentive to supply inaccurate information), the officer's own experience with the probationer, and the need to verify compliance with rules of supervision and state and federal law." *Id.* (internal quotations omitted).

A child protection home inspection order like the one at issue here is neither a dragnet search nor a search of an individual with a reduced expectation of privacy. It is not a dragnet-type search because it does not involve home visits of all homes in an area for a limited purpose as in *Camara* to inspect wiring. Home visits by DHS are in no sense "routine and periodic," but rather must be based upon credible allegations of

evidence of neglect occurring in the specified home.  Mother likewise has no reduced expectation of privacy in the sanctity of her home based upon any suspicion of potential wrongdoing (like with, e.g., probationers and paroles), and DHS does not rely on the *Griffin* or *Samson* line of cases.  As a result, while home visits in the child neglect context are conducted by civil government officials rather than members of law enforcement, they do not fit within the two categories of "administrative searches" entitled to reduced Fourth Amendment and Article 1, Section 8 protections.

Moreover, DHS's entry into Mother's home cannot remotely be characterized as a "minimally intrusive" spot check.  DHS argued in its brief filed with this Court that the trial court informed Mother that DHS would only check for working utilities, windows, a stove, food and beds.  DHS's Brief at 26.  Although it is hard to fathom how the operability of windows could be determined without entering every room to determine the existence of a window, in its order granting DHS permission to enter Mother's home, the trial court imposed **no** limitations and provided only that the search would "assess the home to verify if mother's home is safe and appropriate."  Petitions to Compel Cooperation Order, 6/11/2019.  The order thus placed no limitations on the scope of the search, leaving it entirely in DHS's discretion as to the thoroughness of the search, including, if it so chose, a general rummaging of all of the home's rooms and the family's belongings.

In *Wyman*, a refusal to allow a home inspection would have the limited consequence of termination of the conditional governmental financial assistance.  In the case of any court ordered entry by a child protective service agent, depending upon the

findings in the home, the inspection could result in criminal charges for child abuse[17] or for any criminal activity discovered during the search. More significantly, the home visit could result in the parents' loss of their children, either temporarily or permanently. The United States Supreme Court has held that natural parents have a fundamental liberty interest in the "care, custody, and management" of their children and that a natural parent's "desire for and right to the companionship, care, custody, and management of his or her children is a [liberty] interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59 (1982) (citations omitted). Likewise, this Court has affirmed that the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental liberty interests protected by due process. *Hiller v. Fausey*, 904 A.2d 875, 885 (Pa. 2006) (citing *Troxel v. Granville*, 530 U.S. 57, 67 (2000); *see also Lassiter v. Dep't of Soc. Servs. of Durham Cty, N.C.*, 452 U.S. 18, 27 (1981) (observing that "a parent's desire for and right to the companionship, care, custody and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection"). Accordingly, while state agencies have an interest in investigating credible allegations of child neglect, nothing short of probable cause, guided by the traditional principles that govern its federal and state constitutional limitations, will

---

[17] Child neglect could in some cases result in criminal charges. The CPSL defines "child abuse" to include intentionally, knowingly or recklessly "[c]ausing serious physical neglect of a child." 23 Pa.C.S. § 6303. In turn, "serious physical neglect" can include the "failure to provide a child with adequate essentials of life, including food, shelter or medical care." *Id.* If CPS makes a finding of abuse, they can initiate the proceedings to take a child into protective custody. 23 Pa.C.S. § 6315(a)(4).

suffice when a trial court makes a determination as to whether or not to authorize a home visit.

The trial court and Superior Court here both cited the Beck Concurrence for the proposition that "[w]hat constitutes probable cause in the child protective arena is far different from what constitutes probable cause in the criminal law[,]" *Petition to Compel Cooperation*, 875 A.2d at 380 (Beck, J., concurring), and that as a result a distinct or lesser standard of probable cause is sufficient for a home inspection in a child neglect investigation. In *Petition to Compel,* the Susquehanna County Services for Children and Youth ("C & Y") filed a petition to compel cooperation to permit a caseworker to make a home visit of the family residence as part of a child abuse investigation. In its petition, C & Y averred that it had received a referral of possible child abuse at the residence and that the parents had refused to allow the visit. The trial court, without conducting a hearing, signed an order directing the parents to comply with a home visit, and subsequently denied their motion for a temporary stay – stating in his order that 55 Pa. Code § 3490.55(i) provides that a home visit is mandatory.

Parents filed a notice of appeal, arguing that, inter alia, the order was unsupported by probable cause and therefore violated their state and federal constitutional rights against unreasonable searches and seizures. The majority opinion, authored by then-Judge Kate Ford Elliott, unanimously held first that 55 Pa. Code § 3490.55(i), despite its mandatory requirement of a home visit, was subject to the limits of Fourth Amendment and Article I, Section 8 jurisprudence. In so holding, the majority decision rejected C & Y's contention that Section 3490.55(i) may be enforced without regard to constitutional limitations on entry into a private residence. *Petition to Compel*

*Cooperation*, 875 A.2d at 374. To the contrary, the court, relying in substantial part on the Third Circuit's decision in *Good* discussed earlier, held that a request for a home visit could be enforced only upon a showing of probable cause or an exception thereto (e.g., exigency). The court likewise rejected C & Y's contention, based upon the Supreme Court's decision in *Wyman*, that because social workers played an important role in protecting children, constitutional protections did not apply to them.

> To accept the defendants' claims about the reach of *Wyman* would give the state unfettered and absolute authority to enter private homes and disrupt the tranquility of family life on nothing more than an anonymous rumor that something might be amiss.
>
> Despite the defendants' exaggerated view of their powers, the Fourth Amendment applies to them, as it does to all other officers and agents of the state whose requests to enter, however benign or well-intentioned, are met by a closed door. There is, the defendants' understanding and assertions to the contrary notwithstanding, no social worker exception to the strictures of the Fourth Amendment.

*Id.* at 376 (quoting *Walsh*, 240 F. Supp. 2d 731, 746-47 (citations omitted)).

Having rejected C & Y's contention that no showing of probable cause was required before the trial court could order a home visit, the panel in *Petition to Compel Cooperation* easily concluded that in its petition C & Y had not presented sufficient facts to establish probable cause in its petition. The petition was based solely on C & Y's belief that a home inspection was statutorily mandated. The petition cited only to a Childline referral for possible "medical neglect," with no explanation or description of the alleged neglect. It did not contend that an emergency situation existed or that the child's life was in imminent danger. *Id.* at 378. There were no allegations supporting a nexus between the family home and the factual allegations of child abuse (i.e., "medical

neglect"). *Id.* In the absence of probable cause, the court reversed the trial court's order permitting entry into the family home.

The Beck Concurrence was joined by the two other members of the panel. Despite unanimous acceptance, the Beck Concurrence was dicta, as its discussion of the probable cause standard was entirely irrelevant to the disposition of the case where there were no allegations to support probable cause because the agency did not believe that any were necessary given the statutory mandate. Moreover, aside from saying the standard is different when a child protective services home inspection is at issue rather than a criminal investigation, it does not explain how that is so. The Beck Concurrence instead more generally provides that "[s]ocial services agencies should be held accountable for presenting sufficient reasons to warrant a home visit." *Petition to Compel Cooperation*, 875 A.2d at 380 (Beck, J., concurring).

Contrary to DHS and the lower courts here, we do not read the Beck Concurrence to advocate for a lesser standard of proof, or a lesser quantum of evidence, to establish probable cause in the child neglect context. After all, the court in *Petition to Compel Cooperation (*including Judge Beck) reversed the trial court's grant of authority to enter the family home based upon a lack of evidence to demonstrate probable cause and criticized C & Y for its "exaggerated view" of its powers to do so without first satisfying constitutional requirements. In context, the Beck Concurrence merely recognizes that because the context of a child service home inspection is different from a criminal investigation, the facts supporting probable cause to enter the home will likewise be different.

We agree that the evidence necessary to establish probable cause in the child neglect context will sometimes be "different" than is typically presented in a criminal case. For example, a disinterested magistrate in an application for a criminal search warrant cannot consider prior knowledge of the subject of the search. In contrast, as discussed later at page 43 note 19, in a child protective service petition to compel a home visit, the judge presented with the petition oftentimes, by design, may have been assigned continuing oversight over matters involving the family whose home is the subject of the inspection. The judge's prior knowledge of the family circumstances will be part of the probable cause analysis. But what is not "different" is that the evidence necessary to establish probable cause in both settings must be evaluated pursuant to certain basic principles developed primarily in search and seizure jurisprudence (given the abundance of caselaw in this area) – including the existence of a nexus between the areas to be searched and the suspected wrongdoing at issue, an assessment of the veracity and reliability of anonymous sources of evidence, and consideration of the age of the facts in relation to the facts presented to establish probable cause. These fundamental principles are critical to ensure that a court's finding of probable cause is firmly rooted in facts that that support a constitutional intrusion into a private home.

We expressly hold that there is no "social worker exception" to compliance with constitutional limitations on an entry into a home without consent or exigent circumstances.[18] While most often applied with respect to the police, the United States

---

[18] Our holding is in agreement with the binding panel decision in *Petition to Compel Cooperation*, 875 A.2d at 375-76.

(Continued…)

Supreme Court has ruled that "[t]he basic purpose of [the Fourth] Amendment ... is to safeguard the privacy and security of individuals against arbitrary invasions **by governmental officials**." *New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) (emphasis added). As a result, the Fourth Amendment applies equally whether the government official is a police officer conducting a criminal investigation or a caseworker conducting a civil child welfare investigation. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1205 (10th Cir. 2003) ("[T]he defendants' contention that the Fourth Amendment does not apply in the 'noncriminal' and 'noninvestigatory' context is without foundation.").

_____

(…continued)
The Concurring and Dissenting Opinion insists that it does not favor implementation of a "social workers exception" to permit DHS caseworkers to obtain home visit orders without a showing of probable cause. Concurring and Dissenting Op. (Dougherty, J.) at 6. Other than to describe the type of evidence that is **not** required to establish probable cause in the child welfare context (i.e., the type or quantum of evidence necessary in the criminal context), the Concurring and Dissenting Opinion does not identify what type or quantum of evidence is required to establish probable case in the child welfare milieu. The Concurring and Dissenting Opinion references the "individualized and fact-sensitive civil administration" of the CPSL, *id.* at 7. but offers no indication of any evidence of individualized suspicion or fact-sensitive information" actually discovered or developed by DHS in this case. Likewise, the Concurring and Dissenting Opinion indicates that in accordance with its "risk assessment model," DHS must have "some discretion in translating the information supplied by a reporter, along with any other information revealed through its own screening and assessment processes, into risk assessment categories such as 'homelessness' and 'inadequate basic care.' " *Id.*at 13. As presented in this case, such "discretion," however, is not really discretion at all, but rather a license to translate simple allegations of an unidentified reporter (without any corroboration whatsoever) into serious contentions that might threaten the removal of the children from the home. At the evidentiary hearing, caseworker Richardson translated a contention that the family slept outside of the Philadelphia Housing Authority as part of Mother's protesting activities into a claim that the family was homeless. Likewise, an apparent observation by the unidentified reporter that he or she had not seen Mother feed one of the children during an eight-hour period mushroomed into a serious contention of neglect, not just on the night in question (again, during Mother's protesting activities) but also in the family home necessitating a DHS home visit. This bald translation of the information provided by the reporter in the guise of evidence presented at the hearing cannot, under any type or quantum of evidence, establish probable cause.

We thus join the vast majority of other federal and state courts in explicitly recognizing that the Fourth Amendment (and our own Article I, Section 8) applies to searches conducted in civil child neglect proceedings, which have the same potential for unreasonable government intrusion into the sanctity of the home.  *See, e.g.*, *Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 863-64 (6th Cir. 2012) ("Fourth Amendment standards are the same, whether the state actor is a law enforcement officer or a social worker."); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1250 n. 23 (10th Cir. 2003) ("[A]bsent probable cause and a warrant or exigent circumstances, social workers may not enter an individual's home for the purpose of taking a child into protective custody."); *Walsh*, 240 F. Supp. 2d at 746-47 ("[A]ssertions to the contrary notwithstanding, [there is] no social worker exception to the strictures of the Fourth Amendment."); *People v. Dyer*, 457 P.3d 783, 789 (Colo. App. 2019); *State in Interests of A.R.*, 937 P.2d 1037, 1040 (Utah Ct. App. 1997), *aff'd sub nom., State ex rel. A.R. v. C.R.*, 982 P.2d 73 (Utah 1999); *In re Diane P.*, 494 N.Y.S.2d 881, 883-85 (1985); *In re Robert P.*, 132 Cal. Rptr. 5, 11-12 (Cal. Dist. Ct. App. 1976) (stating that the Fourth Amendment applies in civil child protective proceeding).

C.      **The Absence of Probable Cause in the Present Case**

In criminal matters, when presented with an application for a search warrant, the issuing authority considers only the information contained in the "four corners" of the application and the supporting affidavit.  *Commonwealth v. Housman*, 986 A.2d 822, 843 (Pa. 2009); Pa.R.Crim.P. 203(B).  In contrast, here both the trial court and the Superior Court also took into consideration the testimony presented at the evidentiary hearing on the Petitions to Compel.  We take no issue with this approach in connection

with efforts to establish probable cause to compel a home visit as long as the testimony is cabined by the allegations in the petition. We note that the CPSL contains no provision requiring the trial court to conduct an evidentiary hearing in connection with the filing of a petition to compel cooperation with a home visit in a proceeding initiated by the filing of a GPS report. At its discretion, the trial court may either hold an evidentiary hearing or issue a ruling on the averments of fact set forth in the petition to compel. In either case, a probable cause finding must be supported by the allegations in the petition and supporting testimony, if any.

In this regard, we note that the two dissenting opinions both disagree that the evidence at the hearing must be limited to the averments set forth in the Petitions to Compel, and even take no issue with DHS's decision to amend the content of the Petitions to Compel by presenting testimony in direct contradiction to the allegations that it had set forth in those Petitions to Compel. Concurring and Dissenting Opinion (Dougherty, J.) at 12-13; Dissenting Opinion (Mundy, J.) at 4. We disagree, as parents, in order to protect the sanctity of their homes, are entitled, at a minimum, to the basic tenets of due process, which include, fundamentally, the key principles underpinning due process – notice and an opportunity to be heard. *Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 956 A.2d 956, 965 (Pa. 2008). DHS may not, consistent with the fundamental principles of due process, set forth its allegations of alleged wrongdoing in a verified petition to compel a home visit, but then at the evidentiary hearing on the petition present entirely contrary evidence. The Petitions to Compel in this case were verified by a representative of DHS, but as both of the dissenting opinions acknowledge, DHS's sole witness (caseworker Richardson) took the stand and disavowed key evidence in

the Petitions to Compel regarding the family's alleged homelessness (namely that she saw Mother and her children enter the home). Concurring and Dissenting Opinion (Dougherty, J.) at 12-13; Dissenting Opinion (Mundy, J.) at .4 What had not been an issue even mentioned in the Petitions to Compel (homelessness) suddenly became a significant issue, at least in the eyes of the trial court. The Petitions to Compel thus not only failed to provide Mother with notice of an important issue, but also misled her with regard to the evidence that DHS intended to introduce at the evidentiary hearing. If Mother had been on notice of a need to prove that her family lived in the home, she could have introduced any of numerous forms of proof (e.g., recent bills, rental or mortgage documents, etc.) The trial court ordered the home visit, at least in part, to determine whether DHS's allegation of homelessness "had merit." Trial Court Opinion, 9/9/2019, at 7 Adequate notice for due process purposes includes the "right to notice of the issues and an opportunity to offer evidence in furtherance of such issues." *Id.* at 965. When the allegations of wrongdoing and the evidence to support them may be changed during the course of the hearing itself, parents have little or no opportunity either to prepare or respond to any contentions of alleged neglect directed against them.

As recounted above, DHS's involvement in this case began with an anonymous GPS report. At the hearing, caseworker Richardson testified that the GPS report contained allegations of "homelessness and inadequate basic care" of Mother's children. N.T., 6/11/2019, at 5. The Petitions to Compel do not state that Mother was homeless, but rather only that on one occasion three weeks prior to the filing of the GPS report Mother and her family had been seen sleeping outside of the Philadelphia

Housing Authority and on a more recent occasion Mother had been observed protesting outside of the Philadelphia Housing Authority from noon until eight in the evening. *See* Petitions to Compel, 5/31/2019, ¶ J. The Petitions to Compel likewise do not describe any generalized "inadequate basic care," but rather allege only that during the eight hours she was protesting at the Philadelphia Housing Authority on May 21, 2019, it was "unknown" whether she had fed her children. *Id.*

To the extent that the contention that the family slept outside of the Philadelphia Housing Authority on one occasion could be construed as evidence of homelessness (rather than just part of her protesting activities), DHS disproved this contention during its limited investigation. First, the anonymous source of the GPS report provided DHS with the family's address, and DHS then promptly sent a representative of Project Home to approach Mother. Mother informed the representative of her protesting activities at the Philadelphia Housing Authority but denied that she or her family was homeless. Caseworker Richardson then verified Mother's address in DHS's files and proceeded to the residence, where she confronted Father and later observed the arrival of Mother and the children. *Id.* ¶ L. Caseworker Richardson left but returned later in the day, when she again found Mother and Father at the home. Having located the family's home and repeatedly finding Mother and Father there, any allegation of homelessness was rendered moot. If all of this was not sufficient evidence of a lack of homelessness, by the end of the evidentiary hearing DHS unmistakably confirmed that it no longer considered the family to be homeless, as it requested an order to conduct a home visit at the very house where caseworker Richardson had visited twice on the day in question.

At that juncture, the only remaining allegation in the Petitions to Compel was that the anonymous reporter had not observed Mother feed one of the children on a single day for approximately eight hours. The DHS caseworker's characterization of this allegation as "inadequate basic care" was hyperbole. At the hearing, DHS did not offer any evidence to corroborate this specific allegation or of any other instance of current neglect of the children of any kind that it discovered in its investigation prior to filing the Petitions to Compel.

Without reference to the claims in the Petitions to Compel, or recognition of the lack of evidence to support them, the trial court questioned Mother regarding the status of the utility service to the home, the presence of food in the home, whether there was adequate bedding and clothing, whether the children had treating physicians and dentist, and whether Mother was employed. *See* N.T., 6/11/2019, at 12-14. Although Mother answered these questions appropriately by denying any general neglect of her children (and without any allegation or evidence to the contrary), the trial court nevertheless concluded that the evidence presented formed the basis for a finding of probable cause to grant DHS a home visit:

> The Motion to Compel and the hearing confirmed that one of the main factors of the DHS investigation is the matter of homelessness and if the alleged address of the family was suitable for Children. The home assessment by DHS would be able to determine the claims for both homelessness and inadequate care of Children have merit. The trial court determined that the Motion to Compel provided probable cause to complete the assessment of the family home.

Trial Court Opinion 9/9/2019, at 7-8.

This analysis reveals a decision and fact-finding untethered to the allegations or evidence before the trial court. Richardson's testimony confirmed that the family was

not homeless,[19] and there were no allegations in the Petitions to Compel, and no evidence presented at the hearing, to substantiate any issues with the children's health or that the home was lacking in any respect. We reiterate: the only potentially viable allegation of any current or ongoing neglect before the trial court at the hearing on the Petitions to Compel was an anonymous report of a possible failure to feed one of the children for a portion of one day. DHS offered no evidence to corroborate this allegation or to support the more general contention that the children were malnourished or otherwise not regularly being fed. Without any evidence to substantiate the allegations of neglect of the children, no probable cause existed to order DHS to conduct a home visit.

To the extent that the trial court was suspicious that the home conditions of prior years could possibly have returned despite the lack of evidence to even support a suspicion, this was a fundamental error. Respectfully, reasoning of this sort appears to rest on an unsupportable presumption that once neglectful parents will always be deficient in the care of their children. Mother and Father had resolved the home-related issues in prior years, resulting in DHS lifting Y.W.-B.'s protective supervision in 2015. At the time of the events at issue here, there was no evidence of any reoccurrence of those prior shortfalls. While it was not inappropriate for the trial judge to view any current allegations through the prism of prior experiences with the family, it was entirely

---

[19] The Dissenting Opinion contends that as "the allegations of homelessness remained an issue, along with the allegations of inadequate basic care, there was a clear connection between the allegations in the petition and the requested investigative home visit." Dissenting Opinion (Mundy, J.) at 6. For all of the reasons set forth here, we respectfully disagree that the record supports such a contention.

inappropriate to order a home visit based solely on prior events without any evidence of a reoccurrence.

As a reviewing court, the Superior Court's inquiry was limited to determining whether there was a substantial basis in the record for the trial court to find probable cause. *Jacoby*, 170 A.3d at 1082. As we outlined in connection with the trial court's ruling, the paucity of evidence offered in this proceeding does not provide a substantial basis for a finding of probable cause. The Superior Court erred in reaching a contrary conclusion.

> The averments in DHS's petition, supported by evidence at the hearing, corroborated the initial report that Mother was outside the [Philadelphia Housing Authority] office and the allegation that there was a fire at Mother's current residence. Although Mother asserted her previous residence was damaged by fire, the trial court was under no obligation to credit Mother's alleged explanation, particularly since DHS workers ultimately observed at least some damage to Mother's current residence, namely the boarded-up window, which was consistent with damage from a fire. *Cf. Commonwealth v. Torres*, [] 764 A.2d 532, 538 n.5, 539 & 540 n.8 ([Pa.] 2001) (corroboration of information freely available to the public does not constitute sufficient indicia of reliability, but indications that a sources had some "special familiarity" with a defendant's personal affairs may support a finding of reliability).
>
> The trial court was also entitled to consider its prior experiences with the family, as well as Mother's demeanor at the hearing. *See Pet. to Compel*, 875 A.2d at 380 (Beck, J., concurring). Moreover, it was within the province of the trial court to resolve conflicts between the petition to compel and the testimony at the hearing when evaluating whether there was probable cause to compel Mother's cooperation with the home visit. *Cf. Marshall*, 568 A.2d at 595.
>
> *       *       *
>
> Moreover, there was a "link" between the allegations and DHS's petition to enter the home. *See D.R.*, 216 A.3d at

> 295. Accordingly, we affirm the trial court's conclusion that that there was a fair probability that Children could have been in need of services, and that evidence relating to the need for services could have been found inside the home.

*In Interest of Y.W.-B*, 241 A.3d at 390.

The Superior Court's probable cause analysis fails in several respects. First, while the court indicated that there was a "link" between the allegations and DHS's petition to enter the home, it did not explain what that link was between the home inspection and the allegation that Mother may have failed to feed one of the children for eight hours. To establish probable cause, there must be a specific "nexus between the items to be [searched] and the suspected crime committed[.]" *Commonwealth v. Johnson*, 240 A.3d 575, 587 (Pa. 2020) (plurality) (quoting *Commonwealth v. Butler*, 291 A.2d 89, 90 (Pa. 1972)); *see also Commonwealth. v. Kline*, 335 A.2d 361, 364 (Pa. Super. 1975) ("Probable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home."). In the case that the Superior Court cited to support the necessity of a nexus, *In Interest of D.R.*, 216 A.3d 286 (Pa. Super 2019), *affirmed*, 232 A.3d 547 (Pa. 2020),[20] the Fayette County child protective services agency filed a motion seeking to compel cooperation with a home inspection, alleging that it had received three reports of incidents in which a father was observed to be under the influence of an unspecified substance, and that during one of those instances, he was in the company of one of his five children. The

---

[20] This Court's review was limited to addressing the agency's authority to compel a parent to submit to an observed urine sample for analysis as part of its investigation. *In Interest of D.R.*, 232 A.3d at 558. We affirmed the Superior Court's ruling that under the unambiguous provisions of the CPSL, the agency lacked any such authority. *Id.* at 559. We did not grant allocatur to consider the issues raised in the current appeal.

Superior Court reversed the trial court's grant of the motion, concluding, inter alia, that the agency had wholly failed to allege a connection between the alleged misconduct and the family's home. *Id.* at 294-95 ("[C]ritically, Fayette CYS did not allege a link between the alleged abuse/neglect and the parents' home.").

Based upon our review of the record, no nexus existed between the allegations in the Petitions to Compel and Mother's home. The Petitions to Compel state that during an eight-hour period, while protesting before the Philadelphia Housing Authority, it was "unknown" whether Mother fed her child who was with her. This allegation has no connection whatsoever to the family's home. Even assuming a lack of food in the home on the day of the inspection, that would not be evidence to support the contention that Mother failed to feed one of her children during her eight-hour protest on May 21, 2019 in front of the Philadelphia Housing Authority. We reiterate that there was no evidence, or even an allegation, that the children exhibited signs of malnourishment or even that DHS uncovered other days in which the children appeared to go without food.

Second, the Superior Court also erred in considering Mother's prior experiences with DHS in its probable cause analysis because the trial court placed no express reliance on it. Y.W.-B's dependency ended in 2015 when DHS ceased its protective supervision and discharged the dependency matter. The GPS report contained no allegations that any of the prior deficiencies in the home (e.g., flea infestation, lack of interior walls) had reoccurred or was currently occurring. The current child protective services investigation is not a continuation of the prior proceeding, but rather is wholly unrelated to the prior proceeding that DHS itself terminated in 2015 after concluding that the then-existing issues with the family home had been satisfactorily rectified. The fact

that Mother earned the discharge of the dependency petition four years prior to this proceeding, with no proof of any intervening episodes, made the prior experience totally irrelevant.[21]

Moreover, according to the Petitions to Compel, the current allegations against Mother were related solely to her presence near the Philadelphia Housing Authority and not to any conditions existing inside her current residence. Again, Mother's prior experiences with DHS that ended in 2015 were four years old and there was no evidence of any reoccurrence of prior problems. They were therefore **stale** and provided no evidentiary basis to establish probable cause to enter the home. Stale evidence may not be used to establish the probable cause to issue a search warrant; instead, the conclusion that probable cause exists must be "based on facts which are closely related in time to the date the warrant is issued." *Commonwealth v. Jones*, 484 A.2d 1383, 1389 (Pa. 1984) (Zappala, J., dissenting). "If too old, the information is stale, and probable cause may no longer exist." *Commonwealth v. Leed*, 186 A.3d 405,

---

[21] Although not discussed in the proceedings in this case, we recognize that the trial judge who issued the order in question presided over the 2013 dependency matter for one year prior to its termination. As such, he was aware of the discharge of that petition and the fact that the conditions giving rise to those proceedings has been ameliorated well in advance of the current matter. In addition, the same trial judge granted a petition to compel an inspection of Mother's home in 2016 and the petition was discharged the day after the inspection. *See* supra note 4. This interaction between Mother and the agency was not contained in the current petitions to compel or referenced in the proceedings in this case.

In many counties, repeat incidents involving child welfare are assigned to the same judge for purposes of continuity with the family. When a petition to compel compliance with a home inspection is presented to a judge with prior case involvement with the parents, the judge will be making a probable cause determination with knowledge of the previous proceedings and dispositions. To the extent relevant, the judge may take into account these prior encounters. Here, in issuing the order, the trial judge did not invoke reliance of Mother's history in his courtroom.

413 (Pa. 2018); *In re Smith Children*, 891 N.Y.S.2d 628, 635 (N.Y. Fam. Ct. 2009) ("[W]hile the statute requires the court to consider the child protective or criminal history of a family, such history cannot be proffered as the sole basis for seeking a pre-petition order to gain entry into their home in connection with a new investigation commenced by an anonymous report … three years later."); *see also Commonwealth v. Tolbert*, 424 A.2d 1342, 1344 (Pa. 1981) ("If the issuing officer is presented with evidence of criminal activity at some prior time, this will not support a finding of probable cause as of the date the warrant issues, unless it is also shown that the criminal activity continued up to or about that time".).

Next, the Superior Court failed to address the reliability of the information contained in the Petitions to Compel, which were provided exclusively by the unidentified source that filed the GPS report. DHS offered no evidence at the evidentiary hearing to establish the credibility and reliability of the source or to corroborate any of the information provided by the source. This Court has ruled that where probable cause is "almost entirely based on information gleaned from anonymous sources … [and] there is no attempt made to establish either the basis of knowledge of the anonymous sources or their general veracity, a strong showing of the reliability of the information that they have relayed" is required to support a finding of probable cause. *Commonwealth v. Torres*, 764 A.2d 532, 540 (Pa. 2001); s*ee also Florida v. J.L.*, 529 U.S. 266, 270 (2000) (holding that anonymous tip that juvenile was carrying a weapon did not justify a stop and frisk because "[i]n the instant case, the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown

caller.");. *Commonwealth v. Cramutola*, 676 A.2d 1214, 1216 (Pa. Super. 1996) ("[I]nformation provided to the police by an anonymous source can establish probable cause **if it is corroborated**.") (emphasis added); *Croft v. Westmoreland Cty. Children and Youth Servs.*, 103 F.3d 1123, 1127 (3d Cir. 1997) (holding that in connection with searches in the child protective services context, "[the investigator] was not … entitled to rely on the unknown credibility of an anonymous informant unless she could corroborate the information through other sources which would have reduced the chance that the informant was recklessly relating incorrect information or had purposely distorted information."); *In re Smith Children*, 891 N.Y.S.2d. at 634 ("In the absence of other reliable information, this Court finds that an anonymous SCR report alone is insufficient to establish 'probable cause' for the issuance of an order of entry in a child protective investigation[.]").

In the present case, the identity of the individual who provided the allegations of neglect summarized in the Petitions to Compel was never identified and did not testify at the evidentiary hearing. The failure to testify was significant in at least four respects. First, there was no evidence to corroborate the anonymous report. In fact, the conjecture as to homelessness was specifically rebutted by Mother to the Project Home representative and by DHS's own investigation and its request for an order to enter the same home that Caseworker Richardson twice visited. Second, the trial court lacked any opportunity to observe the individual's testimony to assess his or her credibility. Third, Mother had no opportunity to provide support for her contention that the GPS report had been filed in retaliation for her protests of the policies of the Philadelphia Housing Authority, which she could have done if, for example, the source of the GPS

report had any affiliation with that governmental body. Fourth, the lack of testimony left unclear the foundation for the statement in the Petitions to Compel that it was "unknown" whether Mother fed her children during the time she was protesting. Did the source observe Mother continually throughout the eight hours of protest on May 21st without seeing Mother provide food to the child?[22] Or, conversely, did the source of this allegation observe Mother with child only sporadically during the eight hour period, such that Mother could have fed the child on many (unobserved) occasions throughout that time period?

Finally, and significantly, DHS had no obligation to keep the identity of the source of the GPS report confidential or to shield him or her from testifying at the evidentiary hearing. The trial court mistakenly believed that DHS was legally required to keep the name of the anonymous source confidential and, accordingly, citing 23 Pa.C.S. § 6340(c), sustained DHS's objections when Mother's counsel asked Richardson to identify the anonymous source of the GPS report. Trial Court Opinion, 9/9/2019, at 8. Section 6340(c) of the CPSL, however, only requires DHS to keep confidential the name of an anonymous reporter of a **CPS** report, i.e., a report alleging child abuse. 23 Pa.C.S. § 6340(c). No similar provision in the CPSL protects the source of a **GPS** report, i.e., a report of, inter alia, child neglect.[23]

---

[22] Mother has consistently denied that she had either of her children with her during her protests on May 21st, a contention contradicted only by the anonymous source of the GPS report.

[23] The Concurring and Dissenting Opinion disagrees with this statutory analysis on the grounds that there is some overlap in the definitions of "child abuse" and "child neglect." Concurring and Dissenting Opinion (Dougherty, J.), at 10. While there is some overlap, it is minimal and clearly not implicated in this case. The definition of "child abuse" includes, inter alia, "[s]erious physical neglect by a perpetrator constituting prolonged or (Continued…)

Our General Assembly has drawn a clear distinction between an individual who makes an anonymous report of child abuse as opposed to one of child neglect – DHS must guard the confidentiality of an individual making allegations of child abuse in a CPS report, but has no similar obligations in cases involving GPS reports alleging child neglect. While DHS could have called the source of the GPS report in this case to provide testimony to corroborate the claims against Mother, it chose not to do so and, accordingly, the allegations set forth in the Petitions to Compel, based solely on this single uncorroborated anonymous source, were insufficient to establish probable cause to justify entry into Mother's home. *See, e.g., Torres*, 764 A.2d at 540.

In its probable cause analysis, the Superior Court placed heavy weight on Mother's perceived demeanor at the evidentiary hearing. While her demeanor may well have had some effect on the trial court's evaluation of her credibility, we are aware of no legal authority to support the proposition that the demeanor of a witness, without more, constitutes a basis for a finding of probable cause to permit entry into that individual's home. In this regard, and without condoning disrespect for the court or the proceeding, we note that Mother's demeanor may well have been, in whole or in part, a reflection of

_____

(…continued)
repeated lack of supervision or the failure to provide the essentials of life, including adequate medical care, which endangers a child's life or development or impairs the child's functioning. ” 55 Pa. Code § 3490.4. The alleged child neglect in this case, involving an uncorroborated allegation of a single instance of potentially failing to feed one of the children for one eight hour period is not the type of serious prolonged and repeated physical neglect necessary to constitute child abuse under the definition of that term in 55 Pa. Code § 3490.4. In the overlap case hypothesized by the Concurring and Dissenting Opinion, the trial court judge would make the call on the appropriate categorization and treat the identity of the reporter accordingly. Here however, we apply the CPSL to the case before us.

her frustration based on her view that the entire episode was in retaliation for her protesting activities.

The Superior Court's reference to fire damage in Mother's current home in its probable cause analysis is dehors the record in this case. The trial court made no finding of fact that Mother's current home had suffered any fire damage. While the Petitions to Compel did indicate that Mother had advised the Project Home worker that a fire had destroyed a **prior** residence, the trial court did not, based upon a boarded window or otherwise, conclude that the present home had suffered fire damage.[24] Fire damage in the current home was not even mentioned at the evidentiary hearing or in the trial court's subsequent Rule 1925(a) written opinion. In short, the trial court did not, as did the Superior Court, take the leap from the existence of a boarded window to fire damage inside the home in the absence of any evidence in support.

For these reasons, Mother's constitutional rights were violated. The order compelling her cooperation with a governmental intrusion into her home was deficient for want of probable cause. Accordingly, we reverse the order of the Superior Court.

Order reversed.

Chief Justice Baer and Justices Saylor and Wecht join the opinion.

Justice Dougherty files a concurring and dissenting opinion in which Justice Todd joins.

---

[24] It is not clear how the trial court could have made such a finding of fact. The Superior Court rightly notes that the trial court had no obligation to find Mother's testimony regarding a fire at a previous home to be credible. *In Interest of Y.W.-B.*, 241 A.3d at 390. The result, however, would merely be to disbelieve that the previous home had been destroyed by fire. Absent any evidence that a fire had damaged Mother's current home, her testimony regarding her prior home could not be "transferred" to her current home.

Justice Mundy files a dissenting opinion.